UNITED STATES of America

v.

The BLACK AND DECKER MANUFACTURING COMPANY and
McCulloch Corporation.

Civ. No. 73–964–B.

United States District Court,
District of Maryland.

Aug. 20, 1976.

Ronald J. Silverman, Frank N. Bentkover, James R. Weiss, Robert W. Wilder, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

David C. Murchison, William J. Boyd, John DeQ. Briggs, III, Bernard J. Cooney, Howrey & Simon, Washington, D.C., Lowell R. Bowen, Miles & Stockbridge, Baltimore, Md., for defendants.

BLAIR, District Judge.

The government commenced this civil antitrust action on September 28, 1973 by filing a complaint alleging that the purchase of the McCulloch Corporation (McCulloch) by the Black and Decker Manufacturing Company (Black & Decker) violates § 7 of the Clayton Act as amended, 15 U.S.C. § 18.[1] Divestiture of the acquired company is the principal relief sought.

A request by the government for a temporary restraining order to prevent consummation of the Black & Decker/McCulloch merger was denied on September 28, 1973.[2] Thereafter on October 23, 1973 the parties agreed to and the court sanctioned a hold separate order whereby Black & Decker would maintain McCulloch as a separate, identifiable business entity pending resolution of this litigation.[3] Trial before the court in the case commenced April 5, 1976 and consumed eight weeks. Nearly thirty witnesses testified, approximately 1000 exhibits were admitted, and the trial transcript exceeds 5000 pages. Subsequent to trial, the parties submitted proposed findings of fact and conclusions of law. Based on this entire record, the court herein makes its findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a).

*Government's Contentions*

The government claims in this section 7 Clayton Act suit that potential competition may be substantially lessened by the acquisition of McCulloch by Black & Decker. Specifically, the government asserts a perceived potential entrant theory that the Black & Decker/McCulloch merger eliminated the pro-competitive effect Black & Decker exerted on the gasoline powered chain saw market by reason of its dominant

---

1. As amended, section 7 of the Clayton Act, provides in pertinent part:

 "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 64 Stat. 1125 (1950), 15 U.S.C. § 18 (1973), amending 38 Stat. 731 (1914).

 *See also* 15 U.S.C. § 25 (1973). It is undisputed that both Black & Decker and McCulloch were "corporations engaged in commerce" within the meaning of § 7 of the Clayton Act. *See* G 1.

 As used throughout this opinion, the following symbols denote the following sources:

 | | |
 |---|---|
 | Tr | Trial Transcript—Witness' Name Preceding |
 | G | Government Exhibit |
 | D | Defendant Exhibit |
 | Jt | Joint Exhibit |

 Bracketed portions denote confidential information. C.D.O. will refer to confidential data omitted.

 Venue lies in this district since defendant Black & Decker is incorporated and has its principal place of business in Maryland. *See* G 1, p. 1.

2. *United States v. Black & Decker Mfg. Co.*, No. B–73–964, Clerk's File, # 6. For convenience and following the practice of the parties, the court will sometimes refer to the Black & Decker/McCulloch combination as a merger.

3. *Id.*, # 9.

position on the edge of the market; an actual potential entrant theory that the Black & Decker/McCulloch merger eliminated Black & Decker as the most significant potential entrant either by internal de novo expansion or toehold acquisition [4] into the gasoline powered chain saw market; and an entrenchment theory that the combination of a major portable electric tool manufacturer, Black & Decker, with one of the largest gasoline chain saw manufacturers,

McCulloch, will entrench and dominate an already oligopolistic gasoline powered chain saw market. The government does not contend that any actual competition, either horizontal or vertical,[5] has been affected by the Black & Decker/McCulloch merger.

### The Merger

On October 1, 1973, pursuant to an agreement of July 11, 1973, Black & Decker acquired for 550,000 of its shares the out-

**4.** As used in this opinion, de novo entry denotes entry into a market through internal expansion by the entering firm without the acquisition of a firm presently in the market. A toehold acquisition involves the purchase of a small competitor in the market. *See United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1258 (C.D.Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 864–65 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *The Bendix Corp.*, Trade Reg.Rep. ¶ 19,288, p. 21,445 (FTC 1970), *vacated and remanded on other grounds*, 450 F.2d 534 (6th Cir. 1971). *See generally* Fox, Toehold Acquisitions, Potential Toehold Acquisitions and Section 7 of the Clayton Act, 42 Antitrust L.J. 573 (1973); Note, The Potential Competition Doctrine After *Marine Bancorporation*, 63 Geo.L.J. 969, 970–74 (1975); R.D., 89 Harv.L.Rev. 800 (1976). A rule that a firm having less than a 10% market share will ordinarily constitute a toehold has apparently been adopted by the FTC. *See The Budd Co.*, 3 Trade Reg.Rep. ¶ 20,998 (FTC 1975). *See also Beatrice Foods Co.*, 3 Trade Reg.Rep. ¶ 20,944, p. 20, 792 n.8 (FTC 1975).

**5.** A horizontal merger is one between two actual competitors in the same market. *See, e. g., United States v. Pabst Brewing Co.*, 384 U.S. 546, 550–51, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); *United States v. Aluminum Co. of America*, 377 U.S. 271, 280, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 323, 364, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). A vertical merger usually involves an acquisition in a market where the acquiring firm has been a buyer or a seller, and where a customer-supplier relationship has existed between the acquired and acquiring companies prior to the merger. Typically by a vertical merger a manufacturer will integrate its manufacturing processes forward. *See, e. g., Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. E. I. duPont de Nemours & Co.*, 353 U.S. 586, 590–93, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *United States Steel Corp. v. FTC*, 426 F.2d 592, 593 (6th Cir. 1970).

The merger involved in this case is of the conglomerate variety, that is, one where the acquiring and the acquired companies are not closely economically related. *See Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 74 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974). Within the conglomerate merger category, three subspecies exist: the product extension merger, the geographic extension merger, and the pure conglomerate merger. A product extension merger, which the government contends the Black & Decker/McCulloch merger to represent, is undertaken by the acquiring company to expand its product line into a complementary product area. *See, e. g., FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577–78, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc.*, 414 F.2d 506, 517–18 (3d Cir. 1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); *United States v. Wilson Sporting Goods Co.*, 288 F.Supp. 543, 548 (N.D.Ill.1968). The geographic extension merger, as the term suggests, involves a firm's acquisition of a company in its product line doing business in a geographic area not previously entered by the acquiring firm. *See, e. g., United States v. Marine Bancorporation*, 418 U.S. 602, 606–07, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 658–59, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 528, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). A pure conglomerate merger, perhaps rarer than the other two types, occurs between companies that do not interrelate economically. *See FTC v. Procter & Gamble Co., supra*, 386 U.S. at 577 n.2, 87 S.Ct. 1224; Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1315 & n.6 (1965). Section 7 of the Clayton Act, of course, applies to all types of mergers. *See FTC v. Procter & Gamble Co., supra* at 577, 87 S.Ct. 1224; *Brown Shoe Co. v. United States, supra*, 370 U.S. at 317 n.31, 82 S.Ct. 1502; *Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., supra* at 509–10 n.7. *See generally*, Turner, *supra*.

standing issued stock of the McCulloch Corporation.[6] *See* Lucier Tr 3533–35; G 1, p. 3; G 6–7; G 178 (Part II, p. 7). With activities and sales world-wide, Black & Decker is a corporation organized under the laws of Maryland, which also is its principal place of business. *See* G 1, p. 1; G 174 (Part I, p. 6). In 1973, the year of the merger, Black & Decker, exclusive of the McCulloch acquisition, had net sales of 427 million dollars, net earnings of 33 million dollars, and in 1972, Black & Decker had assets of 273 million dollars. *See* G 124, p. 10; G 125, p. 1. For the year 1972 Black & Decker ranked 372nd in sales, 206th in net income and 69th in net income as a percent of sales in *Fortune* magazine's ranking of the top 500 American industrial corporations. *See* G 174 (Part II, p. 7).

Black & Decker is primarily engaged, is recognized as, and admits to being a leader and major competitor, in the manufacturing, sale and servicing of portable electric power tools and accessories. *See* G 120, p. 3; G 129–31; G 167, p. 13; G 168, p. 10; G 169, p. 9; G 170, p. 12; G 205–07. These tools include electric drills, shears, screwdrivers, grinders, sanders, circular saws, lawn mowers and trimmers. In the United States these products and others are manufactured at plants in Hampstead and Easton, Maryland, Fayetteville and Tarboro, North Carolina, Beloit, Wisconsin and Anderson, Indiana. *See* Decker Tr 2922; G 108; G 111; G 125, p. 25; G 129–31; G 135–65. A small part of Black & Decker's business, and an area entered through acquisition, is the manufacture of portable air tools and accessories such as pneumatic drills and impact wrenches. These products are manufactured in Solon, Ohio. *See* Decker Tr 2927; G 108; G 111; G 129–31. Again as a result of an acquisition, Black & Decker, in a minor aspect of its business, also produces certain types of stationary woodworking and metalworking equipment, which is manufactured in the United States in Lancaster, Pennsylvania. *See* G 108; G 111; G 129–31. With one exception, all of Black & Decker's products are electrically or air powered; Black & Decker does sell a small gasoline powered generator, the engine for which is sourced, i. e., purchased from another company. *See* G 129–31; G 348. Black & Decker products are sold in over 100,000 retail outlets worldwide. *See* G 121, p. 5; G 168, p. 6; G 171 (Part I, p. 8). In addition to manufacturing, Black & Decker operates over 90 company-owned service centers in the United States while also supplying numerous, authorized independent service stations. *See* G 108; G 130–31; G 194. *See also* G 113, p. 16; G 128–29. Black & Decker has realized about 10% of its total business from these servicing activities. *See* G 172 (Part III, p. 6).

Black & Decker was founded by two inventors in 1910 in Baltimore, Maryland as a small machine shop. In 1914 the company developed the first pistol grip, trigger switch electric drill. Thereafter the company developed and manufactured numerous electric tools and innovated in the development of such products as the portable circular saw, the cordless electric drill, and the cordless electric hedge trimmer. Black & Decker pioneered the manufacture of such low cost equipment for sale to the consumer. *See* Decker Tr 2860–75; G 121, p. 5; G 167, p. 10; G 168, p. 8; G 169, p. 3; G 170, pp. 3, 5–6; G 171, pp. 3–4; D 923, p. 1. For the past fifteen years Black & Decker has

---

**6.** Estimates on the sales value of this Black & Decker stock ranged from 42–65 million dollars. The disparity results from the unregistered nature of the stock and the large number of shares involved, which factors necessitated judgments concerning the extent to which the stock would have to be sold under the current stock exchange values. One hundred thousand of the shares were held in escrow pending disposition of litigation then being pursued against McCulloch. *See* Lucier Tr 3535, 3546; Masterson Tr 4529, 4539; Jernigan Tr 5135; De Podwin Tr 5305–06; G 6–7; D 934 (42 million figure derived from adding in value of 100,000 escrowed shares at Lehman's values).

In addition to the McCulloch Corporation acquired by Black & Decker, other McCulloch enterprises, notably McCulloch Oil Corporation, exist. These enterprises are not the subject of this antitrust action, although at least one concern, McCulloch Oil Corporation, is significant to the defendants' failing company defense, discussed *infra*.

grown at the average rate of approximately 15% a year. *See* G 120, p. 3; G 121, p. 2; G 122, p. 2; G 123, p. 2; G 124, p. 2; G 125, pp. 2, 4; G 167, p. 2; G 175, pp. 2–3; G 178, p. 3. By the 1970's the portable electric tool market had neared saturation and Black & Decker sought to diversify its product line to insure continued growth. *See* Graham Tr 3368–69, 3380; Lucier Tr 3509; G 209.

At the time of the merger McCulloch was incorporated in Wisconsin with its principal place of business in California. *See* G 1, p. 1. McCulloch's primary activity is the manufacture and sale of gasoline powered chain saws. *See* D 323, pp. 7–8. Additionally, the company has manufactured and sold, among other items, chain saw components, two cycle internal combustion engines, gas generators, and gasoline powered hedge trimmers. *See* G 9–10; G 12–20. McCulloch, one of the nation's largest chain saw manufacturers, operates plants in California, Arizona, New York and Australia. *See* G 1, p. 2; G 310A–314B; D 323, pp. 27–30. In 1972, the year prior to the merger, McCulloch's net sales totalled approximately 60 million dollars, its aggregate assets were valued at between 64–65 million dollars, and it suffered an operating loss of 1.4 million dollars.[7] *See* D 227; D 321, pp. 2, 4; D 410; D 431. *See also* G 19. In 1972 McCulloch sold [C.D.O.] gasoline powered chain saws which accounted for approximately [C.D.O.] of the market, the [C.D.O.] industry share.[8] *See* G 312B. These chain saw sales constituted over 85% of McCulloch's total 1972 sales. *See* G 19; G 134, p. 9. McCulloch products were distributed through approximately 9800 retail dealers

and serviced by over 5500 service facilities. *See* G 25, p. 12; G 79.

McCulloch was a family owned corporation, dominated by Robert P. McCulloch, the company's founder and president prior to its merger with Black & Decker. *See* G 11; G 289; D 323, p. 31. McCulloch has existed for about 30 years and originated as a manufacturer of aircraft engines. The company began manufacturing chain saws in the mid to late 1940's. *See* G 285 ("McC History & Organization"); D 323, p. 1; D 330; D 1064. McCulloch's operations have been characterized by product innovations in the gasoline powered chain saw area. In the late 1940's McCulloch pioneered the manufacture of the one man gasoline powered chain saw and the company has since been responsible for the introduction of innovative small, lightweight chain saws.[9] *See* Straetz Tr 109–11; Shaeffer Tr 3061; G 12, pp. 6–7; G 44, p. 3; G 354. *See also* Straetz Tr 115.

### The Market

Analysis of possible anticompetitive consequences under section 7 of the Clayton Act requires definition of the "line of commerce" and "section of the country," that is, the relevant product and geographic markets, affected by the merger. *See United States v. Marine Bancorporation*, 418 U.S. 602, 618, 620–21, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Varney v. Coleman Co.*, 385 F.Supp. 1337, 1344 (D.N.H.1974). The relevant geographic market, that area of the country where anticompeti-

---

**7.** This operating loss was partially offset by the sale of McCulloch Oil Corporation stock owned by McCulloch which yielded extraordinary income amounting to approximately 1.1 million dollars, with a resulting net loss of about $320,000. *See* D 321, p. 4.

In the decade before the merger McCulloch's assets and sales grew substantially. For the fiscal year ending June 30, 1963, McCulloch's assets totalled 32.2 million dollars while its aggregate sales were 41.2 million dollars. *See* G 311, pp. 4, 6. *Compare* G 312–20.

**8.** In 1973, McCulloch was once again [C.D.O.] in the manufacture of gasoline powered chain

saws with total unit sales of [C.D.O.] and a market share of approximately [C.D.O.]. *See* G 311B. Between 1970 and 1974 McCulloch's market share [C.D.O.] from approximately [C.D.O.] to [C.D.O.]. *See* G 310B; G 314. In that same time period McCulloch more than [C.D.O.] its unit sales of chain saws. *Compare* G 314A *with* G 310A.

**9.** Throughout its history, McCulloch has attempted to diversify, not always profitably, its product line through product engineering and research. *See* Masterson Tr 4419–23; G 285 ("McC R & D"); D 311–22; D 323, pp. 23–26; D 330; D 434.

tive effects may exist and where the acquired firm is an actual competitor, has been stipulated by the parties to be the fifty states comprising the United States. *See United States v. Marine Bancorporation, supra,* 418 U.S. at 622, 94 S.Ct. 2856; *United States v. Pabst Brewing Co.,* 384 U.S. 546, 549–50, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 357, 83 S.Ct. 1715; *United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 595–96 (S.D.N.Y. 1958); G 2.

■■■ In defining the product market, the court "must recognize meaningful competition where it is found to exist." *United States v. Continental Can Co.,* 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964). The parties have stipulated the relevant product market to be gasoline powered chain saws. *See* G 2. At trial, however, the parties disagreed whether the relevant product market encompassed only manufacturers and sellers of gasoline powered chain saws or whether the market extended to manufacturers and/or sellers of gasoline powered chain saws. *See* Tr 1119–1121; Tr 1660.[10] By their definition defendants seek to include in the relevant product market such companies as Montgomery Ward and Sears & Roebuck which through private labelling agreements sell under their own name but do not manufacture gasoline powered chain saws.

The defendants do not cite, nor has the court discovered, any precedent supporting the definition of a relevant product market to include manufacturers and/or sellers of a certain product. Contrary, albeit implicit, authority exists. *See, e. g., United States v. Falstaff Brewing Co.,* 410 U.S. 526, 527,

93 S.Ct. 1096, 35 L.Ed.2d 475 (1973); *United States v. Continental Can Co.,* 378 U.S. 441, 447–58, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); *United States v. Standard Oil Co.,* 253 F.Supp. 196, 198 (D.N.J.1966).

The court recognizes that:

[s]ince the purpose of delineating a line of commerce is to provide an adequate basis for measuring the effects of a given acquisition, its contours must, as nearly as possible, conform to competitive reality. Where the area of effective competition cuts across industry lines, so must the relevant line of commerce; otherwise an adequate determination of the merger's true impact cannot be made.

*United States v. Continental Can Co., supra,* 378 U.S. at 457, 84 S.Ct. at 1747. It is thus possible that both the manufacturers of a product and its sellers, while ostensibly in different industries, could fall within the same relevant product market. Commercial realities, however, dictate rejection of the defendants' proposed product market. While one witness from a gas chain saw manufacturer testified that Sears & Roebuck was a competitor, another former gas chain saw manufacturer testified that Sears & Roebuck was not perceived as a competitor, which conclusion is bolstered by the industry trade association's practice of collecting sales data only from manufacturers. *See* Straetz Tr 175; Nolan Tr 687–88; McCallister Tr 797–98. The differences between a manufacturer of a product and its retail seller are significant; the retail seller is primarily a customer of the manufacturer.[11] While a retail seller such as Sears & Roebuck may sell under its private label a gasoline chain saw made by a chain saw

---

**10.** It is unclear if defendants continue to press their theory of the relevant product market, but the issue having been raised, the court will resolve it. *See* Defendants' Proposed Findings of Facts & Conclusions, ¶ 87. Resolution of the product market issue on either side's theory does not significantly vary McCulloch's market position. *See* Jernigan Tr 1899–1902.

**11.** Consideration of the usual indicia of product market-interchangeability of use, cross-elasticity of demand, and distinct product characteris-

tics and uses—does not further analysis of the product market in this case, since the product, gasoline powered chain saws, has been determined. *See United States v. Continental Can Co.,* 378 U.S. 441, 453, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 593–95, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *Calnetics Corp. v. Volkswagen of America, Inc.,* 348 F.Supp. 606, 617 (C.D.Cal.1972).

manufacturer which sells its saws to whole-salers, the two are not in direct competition. The buyer sought by Sears & Roebuck is the ultimate consumer; the chain saw manufacturer seeks to sell to a variety of whole-salers and retailers. Simply stated, the manufacturer of the chain saw and its retail seller operate at different levels in the merchandising process. While "complete inter industry competitive overlap need not be shown", there is no evidence of any significant overlap in this case. *See United States v. Continental Can Co., supra* at 457, 84 S.Ct. at 1747. *Accord United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 662, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974). The relevant product market, then, is the manufacture and sale of gasoline powered chain saws.

In addition to the product market defined above, the government also contends that a submarket exists, the manufacture and sale of lightweight, inexpensive (suggested retail price of less than $170) gasoline powered chain saws which are sold to occasional users, that is, primarily home-owners who do not use the saw to earn their livelihood. *See* Tr 1119. In *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962), the Court delineated the factors to be analyzed in determining the existence of any sub-market:

> . . . within this broad market, well-defined submarkets may exist, which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 593–595, 77 S.Ct. 872, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers,

distinct prices, sensitivity to price changes, and specialized vendors. [foot-note omitted].

*Accord General Foods Corp. v. FTC,* 386 F.2d 936, 940–43 (3d Cir. 1967), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); *United States v. Kennecott Copper Corp.,* 231 F.Supp. 95, 98–100 (S.D.N.Y. 1964), *aff'd per curiam,* 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965). Application of these factors to the facts of this case leads this court to conclude that an occasional user submarket does exist.

It is beyond cavil that the gasoline powered chain saw industry clearly recognizes that its lower priced, lightweight saws, for which demand has risen rapidly, are marketed to a class of occasional users, consumers using the product for a variety of "do it yourself" tasks around the home. *See* Straetz Tr 130–31, 140, 146, 178–79, 287–89; Nolan Tr 558–59; McCallister Tr 798–99, 837–38; Bartelt Tr 1000, 1005–08; Deming Tr 1139–40, 1207–08; G 338(a); G 377 (pp. 13, 17, 150); G 378 (pp. 64–66); G 379 (pp. 34–36, 268–69). McCulloch itself has recognized an occasional user chain saw market. *See* G 21, pp. 8–9; G 25, p. 5; G 42, p. 28; G 64; G 354.

Chain saws manufactured for the occasional user, as opposed to those made for the professional user, are characterized by their lighter weight, smaller engine size, shorter cutting bar and shorter durability. *See* Straetz Tr 140–41, 150–53; McCallister Tr 805–06; Bartelt Tr 1008; G 377 (pp. 13–15, 17–19); G 378 (p. 65, Vol. II, pp. 45–46); G 379 (pp. 34–35). Review of the above testimony and depositions indicates that while some overlap exists between the models sold to the professional logger and to the homeowner (*see* Straetz Tr 167–68; Bartelt Tr 1093–95; D 925), that overlap is minimal since the desired product characteristics of the saws bought by these two classes differ significantly.[12]

---

12. Defendants argue that distinctive weights, power capacities and prices do not exist for the occasional user chain saw. *See* D 511–13; D 516; D 522–31; Epstein Tr 2415–21. Defendants' economist who testified concerning submarket factors employed a gap theory, plotting the gasoline powered chain saw models for which data was available by various attributes such as weight, price, and power. From these graphs defendants argue that no submarket definitely exists since a spectrum of models is offered with no clear gaps in terms of price,

The production facilities and processes used to manufacture gasoline powered chain saws are not distinct, and, hence, this factor suggests the absence of a submarket. *See United States v. Kennecott Copper Co.*, 231 F.Supp. 95, 99 (S.D.N.Y.1964), *aff'd per curiam*, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965); *United States v. Hughes Tool Co.*, 415 F.Supp. 637 at 642 (C.D.Cal.1976); *Beatrice Foods Co.*, 3 Trade Reg.Rep. ¶ 20,944, p. 20,787 n.3 (FTC 1975); Straetz Tr 312–15; Sublett Tr 348; Epstein Tr 2829; Shaeffer Tr 3099–3100. *See generally*, R.D., 89 Harv.L.Rev. 800 (1976). Additionally, the record does not suggest that prices of chain saws below a certain figure (e. g., $170) are insensitive to the prices of more expensive chain saws. For a submarket to exist, however, not all of the *Brown Shoe* criteria must be met. *See General Foods Corp. v. FTC*, 386 F.2d 936, 941 (3d Cir. 1967), *cert. denied*, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); *Reynolds Metals Co. v. FTC*, 114 U.S.App.D.C. 2, 309 F.2d 223, 227 (1962). In this case, the presence of the other *Brown Shoe* criteria outweighs the lack of distinct production facilities and price sensitivity of different gasoline powered chain saw models.

As revealed in the testimony and depositions, gasoline powered chain saws produced for the occasional user are meant for distinct customers. These saws are designed to appeal to the "weekend warrior" homeowner who uses a gasoline powered chain saw infrequently, on the average of 10 hours a year, and who does not use the saw to earn a living. *See* Straetz Tr 131, 151; Nolan Tr 558; McCallister Tr 837–38;

Bartelt Tr 1001–03; G 378 (Part I, p. 64); G 379 (p. 34).

The chain saws produced for the occasional user market also have distinct prices, prices significantly lower than those for professional model saws. Industry testimony concerning the upper limit of prices for occasional user chain saws varied between figures of $150 to $200. *See* Straetz Tr 157, 289 ($200); Nolan Tr 557 ($150–$160); McCallister Tr 838 ($170–$200); Bartelt Tr 1005–06 ($200); Deming Tr 1207 ($170); G 377 (pp. 14–15) ($150–$160); G 379 (pp. 35–36) ($200). McCulloch itself recognized an occasional user submarket with most saws selling at $169 and less. *See* G 22 (pp. 3–4). Defendants strongly contest the existence of a submarket, as advocated by the government, as the manufacture and sale of those gasoline powered chain saws with suggested retail prices of less than $170.[13]

Defendants argue that the same model gasoline powered chain saw, because of private labeling arrangements, may be sold within both the over and under $170 category. It is contended that Sears & Roebuck or some other mass merchandiser under its own label might sell a manufacturer's saw at a price below $170 while the manufacturer's suggested retail price would be over $170. While such pricing disparities may exist, there has been no proof that the practice was sufficiently widespread to defeat the finding of a product submarket. *See* Jt 9 (p. 2); Jt 10 (pp. 2, 7, 9); Jt 25 (p. 2); D 564A.

Additionally, defendants assert that manufacturer price changes could place the

weight, and power features. The major difficulty with this analysis, aside from its lack of legal foundation, is that the appearance of gaps is solely a function of the interval chosen with which to plot the product features. For example, in classifying the chain saws by weight, an interval of one pound might produce no gap in the spectrum of weights offered, but an interval of one-half pound could result in such a gap. *See* Epstein Tr 2615–16. Additionally by categorizing chain saws exclusively by product feature, defendants' economist failed to account for the critical role of demand. While a spectrum of models in terms of weight, price and power may be offered, certain models with

particular characteristics may be vastly more popular than others, which popularity could tend to suggest a product submarket. *See* Epstein Tr 2590–93.

13. Initially, defendants question the government's methodology in deriving the submarket figures. *See* Defendants' Proposed Findings of Facts & Conclusions, ¶¶ 284–301. While examined extensively at trial, the alleged deficiencies with one or two minor exceptions (*see* G 317; Jernigan Tr 1493–95) were inconsequential and did not undermine the validity of the government's case in this regard.

same model gasoline powered chain saw in different price categories (above and below $170) in different years and even in the same year. *See, e. g.,* Jt 2 (p. 2) [C.D.O.]; Jt 26 (pp. 2–3) [C.D.O.]; Jt 40 (pp. 2–3) [C.D.O.]. These discrepancies, coupled with the industry's most common recognition of $200 as the upper limit for the occasional user, persuade the court that the submarket should be defined as the manufacture and sale of gasoline powered chain saws with a suggested retail price of less than $200.

By that figure, sales of occasional user chain saws have thinned out significantly. *See* Straetz Tr 155, 289. Of course, some occasional user sales are made of gasoline powered chain saws priced in excess of $200. *See* Nolan Tr 1006. The clear weight of the testimony, however, is that by far most of the occasional users purchase gasoline powered chain saws priced less than $200. The court recognizes the problems inherent in employing arbitrary price limits in defining a product submarket. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 326, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Beatrice Foods Co.,* 3 Trade Reg. Rep. ¶ 20,944, pp. 20,786–87 (FTC 1975). *But see United States v. Aluminum Co. of America,* 377 U.S. 271, 276, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Yet some approximation is needed to "recognize meaningful competition where it is found to exist." *United States v. Continental Can Co.,* 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964). "The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds. . . . Obviously no magic inheres in numbers . . . ." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 611–12, 73 S.Ct. 872, 881, 97 L.Ed. 1277 (1953). "Industrial activities cannot be confined to trim categories." *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). *Accord United States v. Continental Can Co., supra,* 378 U.S. at 456, 84 S.Ct. 1738. While limiting the submar-

ket of occasional user chain saws to those with suggested retail prices under $200 does not confine the market precisely, the ceiling does insure that the great majority of occasional user sales are included.[14]

Finally, the presence of specialized vendors for the occasional user chain saw indicates a submarket. Occasional user chain saws, unlike professional chain saws, are sold predominantly through hardware outlets with some marketing done through mass merchandisers. *See* Straetz Tr 153–55; McCallister Tr 834–35, 972–74; Bartelt Tr 1011; Deming Tr 1139–40; G 377 (pp. 24–26). Relatedly, the occasional user chain saws are largely advertised through popular media such as television while saws for professional users are primarily advertised in specialty trade publications. *See* Straetz Tr 155–57; Bartelt Tr 1023–24; G 377 (pp. 26–27).

For the reasons stated in the foregoing analysis of, *inter alia,* the *Brown Shoe* criteria, the court holds that the product market involved in this case is the manufacture and sale of gasoline powered chain saws and that a submarket, the manufacture and sale of gasoline powered chain saws retailing for less than $200, also exists and is significant for analysis of possible antitrust implications of the Black & Decker/McCulloch merger.

Since its inception over thirty years ago, the gasoline powered chain saw industry, as defined above, has witnessed a gradual evolution from large, heavy two man chain saws to lighter weight, portable models. *See* Straetz Tr 108–11, 132–34, 136, 140–41; G 12 (pp. 6–7); G 285 ("McC Marketing" p. 1); G 378 (pp. 20–21). In that period the number of companies in the market has grown steadily from less than ten to more than thirty presently. *See* D 538. Among the firms entering the market were several prominent foreign manufacturers including Husqvarna, Jobu and Kioritz. *See* D 538; Jt 17–19. With the declining weight of the

---

14. Defendants also suggest that the same model with different accessories could fall on both sides of a $170 range. There has been no showing of the frequency of any such customi-

zation and, in any event, definition of the submarket at the $200 level should alleviate this problem, to the extent it exists.

chain saws, the average prices also dropped, thereby expanding the product's appeal from professional loggers alone to include also homeowners and farmers. *See* Straetz Tr 126, 132–35; G 377 (pp. 110–11, 167–68); D 989 (pp. 204–05). Concomitantly, the distribution channels for gasoline powered chain saws broadened to include lawn and garden dealers and mass merchandisers such as Sears & Roebuck, Western Auto and Montgomery Ward. *See* Straetz Tr 135; D 538. Advertising patterns also reflected this shifting demand with television being more commonly employed to reach potential consumers. *See* Straetz Tr 137–38. The declining price and broader market contributed to the explosive sales growth that the gasoline powered chain saw market has enjoyed, with unit sales nearly tripling from 1970 to 1974 alone. *See* G 316A. Concisely stated, the gasoline powered chain saw industry, once focused on sales exclusively to professionals, has become increasingly involved in marketing a consumer product.

### Section 7 of the Clayton Act

 Section 7 of the Clayton Act[15] was amended by Congress in 1950 in response to "a fear of what was considered to be a rising tide of economic concentration in the American economy. . . ." *Brown Shoe Co. v. United States*, 370 U.S. 294, 315, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510 (1962). In amending section 7, Congress sought to effectuate the policy "that corporate growth by internal expansion is socially preferable to growth by acquisition" and to "preserv[e] the possibility of eventual deconcentration".[16] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 365 n.42,

370, 83 S.Ct. 1715, 1742, 10 L.Ed.2d 915 (1963). *Accord United States v. Aluminum Co. of America*, 377 U.S. 271, 279, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Consistent with this Congressional purpose, section 7 was designed to cope with restraints of trade and monopolistic tendencies "in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding . . . ." and before mergers constituted a "clear-cut menace to competition." S.Rep.No.1775, 81st Cong., 2d Sess. pp. 4–5, *quoted in United States v. Atlantic Richfield Co.*, 297 F.Supp. 1061, 1066 (S.D.N.Y.1969), aff'd mem. sub nom., *Bartlett v. United States*, 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971); *Brown Shoe Co. v. United States, supra*, 370 U.S. at 323, 82 S.Ct. 1502. *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967); *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 170–71, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

As the Court stated in. *FTC v. Procter & Gamble Co., supra* :

[T]he core question [under section 7] is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. The section can deal only with probabilities, not with certainties. And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwart-

---

**15.** *See* note 1 *supra*.

Section 7 of the Clayton Act was amended in 1950 by the Celler-Kefauver Antimerger Act which significantly enlarged the statute's scope. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 311–23, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 556–58, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (Marshall, J., concurring); *American Crystal Sugar Co. v. Cuban-Amer. Sugar Co.*, 259 F.2d 524, 526–27 (2d Cir. 1958);

*United States v. Bethlehem Steel Co.*, 168 F.Supp. 576, 581–83 (S.D.N.Y.1958).

**16.** "It is the basic premise of [§ 7] that competition will be most vital 'when there are many sellers, none of which has any significant market share.'" *United States v. Aluminum Co. of America*, 377 U.S. 271, 280, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314 (1964), *quoting, United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

ing such practices in their incipiency would be frustrated. [citations omitted]. *See United States v. Von's Grocery Co.*, 384 U.S. 270, 277, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); *United States v. Penn-Olin Chemical Co., supra*, 378 U.S. at 170–71, 84 S.Ct. 1710; *United States v. Philadelphia Nat'l Bank, supra*, 374 U.S. at 362, 83 S.Ct. 1715; S.Rep.No.1775, 81st Cong., 2d Sess., p. 6, *quoted in, United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 603 (S.D.N.Y.1958). Of course, while section 7 does not require certainty of anticompetitive effect, "proof of a mere *possibility* of a prohibited restraint or tendency to monopoly will not establish the statutory requirement". *United States v. E. I. du Pont de Nemours & Co., supra*, 353 U.S. at 598, 77 S.Ct. at 880 [emphasis in original]. *See United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1232 (C.D.Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

 As noted previously, the Black & Decker/McCulloch merger is alleged to involve the loss of potential competition. For the potential competition doctrine to operate, the relevant market must be concentrated, since in a competitive market potential competition will not influence market behavior.[17] In this concentrated market, the oligopolists enjoy substantial market shares and the capacity to control price and production output. Parallel pricing policies may exist by which the oligopolists seek to attain excess profits. Potential competition has a moderating impact on these anticompetitive practices.

The actual potential entrant aspect of potential competition is concerned with the means of entry chosen by the firm entering the market.[18] Actual potential entrant theory favors entry into the market by internal expansion, de novo, or by acquisition of a small firm in the market, a so called toehold acquisition.[19] By entering a market internally, the actual potential entrant adds new production capacity and has significant incentive to avoid the anticompetitive oligopolistic market practices in order to realize and expand a market share. By acquiring a small firm, the actual potential entrant may bring similar competitive forces to bear on the concentrated market in attempting to augment the toehold's small market share.[20]

Both of these avenues of entry, de novo and toehold acquisition, are thought to be preferable to acquisition by the actual potential entrant of a large firm in the market, where given its large instant market share, the new entrant may well favor continuation of the market's oligopolistic practices. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 560–61, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (Marshall, J., concurring).[21] As the court stated in *United States v. Phillips Petroleum Co., supra* at 1232:

**17.** *See United States v. Marine Bancorporation*, 418 U.S. 602, 630, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

**18.** While recognizing the perceived potential entrant aspect of potential competition, the Supreme Court has twice recently expressly reserved decision on whether the actual potential entrant aspect constitutes a cause of action under section 7 of the Clayton Act. *See United States v. Marine Bancorporation, supra* at 625, 639, 94 S.Ct. 2856; *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 537, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). The Court had earlier intimated acceptance of the theory. *See Ford Motor Co. v. United States*, 405 U.S. 562, 567–68, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972); *FTC v. Procter & Gamble Co., supra*, 386 U.S. at 580–81, 87 S.Ct. 1224; *United States v. Penn-Olin Chemical Co., supra*, 378 U.S. at

172–74, 84 S.Ct. 1710. *See also United States v. Falstaff Brewing Corp., supra*, 410 U.S. at 562, 93 S.Ct. 1096 (Marshall, J., concurring).

**19.** *See* note 4 *supra; Texasgulf, Inc. v. Canada Develop. Corp.*, 366 F.Supp. 374, 409–10 (S.D. Tex.1973).

**20.** *See United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1257 (C.D.Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); Turner, Conglomerate Mergers & Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1379–86 (1965).

**21.** *But see Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 860 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

The crux of the entry effect is that if the company which enters the market by acquisition had entered unilaterally [de novo or by toehold acquisition], it would have supplied an additional competitive force without eliminating one already present in the market. An acquisition of a company in the market by a company which is likely to enter on its own thus has an anticompetitive effect on the market. [footnote omitted].

See *United States v. Ford Motor Co.*, 405 U.S. 562, 587, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972) (Burger, C. J., concurring & dissenting).

The perceived potential entrant exerts a "fringe" or "edge" effect on the anticompetitive practices of the market.[22] By its position on the edge of the market, and its apparent willingness to enter the market on certain conditions, such as the lowering of entry barriers, the perceived potential entrant provides a present procompetitive effect. As the Court stated in *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 174, 84 S.Ct. 1710, 1719, 12 L.Ed.2d 775 (1964):

> The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated.

The perceived potential entrant can deter anticompetitive market conduct such as interdependent pricing or production control because if the practices become too pronounced or prices rise too high, the perceived potential entrant could profitably enter the market. The effect of such entry, which might include price competition, could well be unsettling to the oligopolists. In order to prevent such entry, the oligopolists may restrain their anticompetitive practices; it is this beneficial effect and enhanced prospect for a competitive market that the perceived potential entrant theory is designed to foster.[23] "Potential competition . . . as a substitute for . . . [actual competition] may restrain producers from overcharging those to whom they sell or underpaying those from whom they buy. . . ." *Id.*, quoting Wilcox, *Competition and Monopoly in American Industry*, TNEC Monograph No. 21 (1940) 7–8. See *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 581, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

In analyzing whether a company is a perceived potential entrant, the Court in *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 660, 84 S.Ct. 1044, 1049, 12 L.Ed.2d 12 (1964) stated, "[t]he effect on competition in a particular market . . . is determined by the nature or extent of that market and by the nearness of the absorbed company to it, that company's eagerness to enter that market, its resourcefulness, and so on."[24] See *United States v. Marine Bancorporation*, 418 U.S. 602, 633, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

The third anticompetitive effect allegedly precipitated by the Black & Decker/McCulloch merger is the entrenchment of McCulloch as the leading firm in the gasoline powered chain saw market. Briefly stated, entrenchment arises when the acquiring firm has resources such as marketing ad-

---

**22.** See generally Turner, *supra* at 1362–79.

**23.** See *United States v. Falstaff Brewing Co.*, 410 U.S. 526, 531–33, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). For the perceived potential entrant to enhance competitive possibilities, it must be part of a small group, since if a large group of potential entrants exists, the loss of one will be insignificant. See *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 581, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. Crowell, Collier & Macmillan, Inc.*, 361 F.Supp. 983, 996 (S.D.N.Y.1973); *United States v. Crocker-Anglo Nat'l Bank*, 277 F.Supp. 133, 184 (N.D.Cal. 1967); Turner, *supra* at 1363.

**24.** The same factors, incentive and capability to enter, indicating a firm to be a perceived potential entrant also pertain to the analysis of the firm as an actual potential entrant. A firm, then, can be both a perceived and an actual potential entrant. See *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1234 (C.D. Cal.1973), aff'd per curiam, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *United States v. Falstaff Brewing Co., supra*, 410 U.S. at 534–35 n.13, 93 S.Ct. 1096. Cf. *United States v. Marine Bancorporation, supra*, 418 U.S. at 639, 94 S.Ct. 2856.

vantages or financial strength that, when made available to the acquired firm, could raise barriers to entry and result in the acquired firm dominating the market. *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 78–79 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc.*, 414 F.2d 506, 518 (3d Cir. 1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); *General Foods Corp. v. FTC*, 386 F.2d 936, 944–47 (3d Cir. 1967), *cert. denied*, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); *Ekco Products Co. v. FTC*, 347 F.2d 745, 752–53 (7th Cir. 1965); *United States v. Crowell, Collier & Macmillan, Inc.*, 361 F.Supp. 983, 991–93, 1002–03 (S.D.N.Y.1973).

### Marine Bancorporation and Potential Competition

In *United States v. Marine Bancorporation, supra*, the Supreme Court, in its most recent potential competition opinion, further refined the doctrine's scope. In *Marine Bancorporation*, a geographic extension merger, the Court explicitly held that for potential competition to operate the relevant market must be concentrated. The Court stated:

> The potential-competition doctrine has meaning only as applied to concentrated markets. That is, the doctrine comes into play only where there are dominant par-

ticipants in the target market engaging in interdependent or parallel behavior and with the capacity effectively to determine price and total output of goods or services. If the target market performs as a competitive market in traditional antitrust terms, the participants in the market will have no occasion to fashion their behavior to take into account the presence of a potential entrant.

418 U.S. at 630, 94 S.Ct. at 2874.[25]

▮ In proving the market to be anticompetitive the government can rely on concentration ratios, if they have sufficient magnitude, to establish a prima facie case.[26] *Id.* at 631, 94 S.Ct. 2856. The defendants may then, however, introduce evidence that the concentration ratios and their structural analysis do not accurately reflect the competitive nature of the market. *Id.*[27] *Marine Bancorporation* thus extends the scope of the judicial inquiry into the economic nature of the relevant market and mandates that in analyzing a potential competition case, a court first determine if the target market is competitive.

Equally significantly, the Court in *Marine Bancorporation*, while reserving final decision on the status of the actual potential entrant aspect of potential competition, nonetheless, formulated two preconditions to its application: (1) that the acquiring firm have feasible alternative means of entering the relevant market other than by acquisition of the target company and (2)

**25.** Earlier cases reflected this requirement of a concentrated market. *See, e. g., United States v. Penn-Olin Chemical Co., supra*, 378 U.S. at 174, 84 S.Ct. 1710; *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 75–76 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *United States v. Crowell, Collier & Macmillan, Inc.*, 361 F.Supp. 983, 1005 (S.D.N.Y.1973).

**26.** In *Marine Bancorporation*, where the Court held the concentration ratios to establish a prima facie case, the market share of the top three banks in the relevant market totalled 92.3%. None of the other banks in the relevant market had shares exceeding 3.1%. *See* 418 U.S. at 607 n.2, 609, 631, 94 S.Ct. 2856.

**27.** The trend away from exclusive reliance on concentration ratios and structural analysis is

discernible in cases preceding *Marine Bancorporation*. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 494–504, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *United States v. Penn-Olin Chemical Co., supra*, 378 U.S. at 176–77, 84 S.Ct. 1710; *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n.38, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Beatrice Foods Co.*, [1970–1975 Transfer Binder] Trade Reg.Rep. ¶ 20,212, p. 22,169 (FTC 1972). *See also United States v. Amax, Inc.*, 402 F.Supp. 956 (D.Conn.1975), *reported in*, BNA, ATRR (No. 738–11/11/75), pp. D–7—D–9; *United States v. M.P.M., Inc.*, 397 F.Supp. 78, 90–95 (D.Colo. 1975). *But see United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362–63, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

that those alternative means "offer a substantial likelihood of ultimately·producing deconcentration of that market or other significant procompetitive effects." 418 U.S. at 633, 639, 94 S.Ct. 2856.[28]

 While not so expressly holding, the Court suggested that these same preconditions are relevant to the perceived potential entrant aspect of potential competition. *Id.* at 639, 94 S.Ct. 2856. The Court reasoned that if feasible alternative means of entry capable of producing deconcentration or other significant procompetitive effects are not known to be available by firms in the market, then there is little possibility of any procompetitive "fringe" effect. *Id.* at 639–40, 94 S.Ct. 2856. In conclusion, the Court stated:

> [i]f regulatory restraints are not determinative, courts should consider the factors that are pertinent to any potential-competition case, including the economic feasibility and likelihood of *de novo* entry, the capabilities and expansion history of the acquiring firm, and the performance

as well as the structural characteristics of the target market.

*Id.* at 642, 94 S.Ct. at 2880.[29]

### Earlier Potential Competition Cases

In *United States v. Penn–Olin Chemical Co.*, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), the Supreme Court first began development of section 7 of the Clayton Act as it applied to potential competition.[30] Pennsalt Chemicals Corporation and Olin Mathieson Company formed a joint venture for the production of sodium chlorate. After holding that § 7 of the Clayton Act extended to joint ventures, the Court reversed the lower court's dismissal of the suit based on the finding that both Pennsalt and Olin Mathieson would not both have entered the sodium chlorate industry but for the joint venture. *See id.* at 167–73, 84 S.Ct. 1710. The Court held that while only one company might have entered, the other could have remained on the edge of the market exerting a procompetitive effect. *See id.* at 173–74, 84 S.Ct. 1710. In *Penn–*

---

**28.** Applying these preconditions in *Marine Bancorporation*, the Court noted that while the acquiring firm clearly possessed the financial capability and the incentive to enter the market, extensive state regulatory restraints precluded the possibility of de novo or toehold entry. 418 U.S. at 633–36, 94 S.Ct. 2856. While not holding the first precondition to have been satisfied, the Court then pointed to the same regulatory restraints as evidence that, even had alternative entry means existed, those avenues could not practically have produced deconcentration or other significant procompetitive effects. *Id.* at 636–39, 94 S.Ct. 2856. In suggesting the second precondition could not be met in the relevant market, the Court noted that earlier a bank had acquired a foothold in the market, which foothold eight years later had only 2.2% of the market. *Id.* at 638, 94 S.Ct. 2856. Beyond this illustration, the Court left for future resolution definition of what will constitute "deconcentration" or "other significant procompetitive effects." *Id.* at 633, 638, 94 S.Ct. 2856.

**29.** In analyzing these factors, both objective and subjective indications of a firm's incentive and capability to enter a market are relevant. While subjective evidence from regulatory officials was relied upon in *Marine Bancorporation*, the Court did not alter the preference for objective evidence. 418 U.S. at 634–39, 641–42, 94 S.Ct. 2856; *see United States v. Phillips Petroleum Corp.*, 367 F.Supp.

1226, 1234–1239 (C.D.Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *United States v. Falstaff Brewing Co.*, 410 U.S. 526, 533, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973); *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 174, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). Testimony of such regulatory officials, presumably neutral sources, does not present the usual difficulties inherent in subjective testimony. *See* 367 F.Supp. at 1238.

**30.** The Court in *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 658–59, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), confronted issues with overtones of potential competition, but the Court did not employ a potential competition analysis. El Paso, the major gas supplier to the California market, acquired Pacific Northwest which, although it did not supply out of state gas to California, had made previous attempts to enter the rapidly expanding California market. *Id.* at 658–69, 84 S.Ct. 1044. These entry attempts clearly precipitated certain competitive pricing practices. *Id.* at 655, 84 S.Ct. 1044. In this unusual fact situation, "the line between potential and actual competition loses much of its significance." *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 861 n.15 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

*Olin*, then, the perceived potential entrant aspect of potential competition was recognized as a theory for relief under section 7.

In *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), Clorox, the nation's leading manufacturer in the concentrated liquid bleach market, was acquired in a product extension merger by Procter & Gamble, a leading detergent manufacturer. Emphasizing the complementary nature of the two company's products, their common consumers, and the critical advantages, including volume discounts, the combined companies enjoyed in advertising and marketing, the Court held the merger to violate section 7.[31] *See id.* at 578–81, 87 S.Ct. 1224. In delineating the entrenchment possibilities the Court noted that the advertising advantages accruing to the merged firms could result in raised entry barriers and that the introduction of a large company such as Procter & Gamble could intimidate the smaller firms in the market into refraining from forceful competition. *See id.* at 578–79, 87 S.Ct. 1224. The Court then elucidated the factors that made Procter & Gamble the most likely entrant into the liquid bleach market: Procter & Gamble's leadership and market power in a similar industry, its diversification policy, and the complementary nature of its products which would allow exploitation of existing marketing channels, of common advertising, and of management experience. Further the Court pointed to the lack of any need for specialized manufacturing processes, the availability of raw materials, the reasonableness of plant cost, and Procter & Gamble's earlier consideration of de novo entry. *See id.* at 580–81, 87 S.Ct. 1224.

In *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973),[32] similar to *Penn-Olin, supra*, the Court [33] remanded to the lower court for consideration of a perceived potential entrant claim. *See id.* at 532–33, 93 S.Ct. 1096. The lower court found, and the Supreme Court did not question, that Falstaff, the only major beer manufacturer not selling in New England and which had acquired Narragansett, the largest seller of beer in New England, would not have entered that market de novo. *See id.* at 530–32, 93 S.Ct. 1096. Nonetheless, the Court held that a finding that Falstaff was not an actual potential entrant did not foreclose the possibility that Falstaff was perceived as a potential entrant and thus exerted a procompetitive effect on the market. *See id.* at 532–37, 93 S.Ct. 1096. In providing guidelines for analysis of the perceived potential entrant claim, the Court stated:

> The specific question . . . is . . whether, given its financial capabilities and conditions in the New England market, it would be reasonable to consider it [Falstaff] a potential entrant into that market. Surely, it cannot be said on this record that Falstaff's general interest in the New England market was unknown; and if it would appear to rational beer merchants in New England that Falstaff might well build a new brewery to supply the northeastern market then its entry by merger becomes suspect under § 7. The District Court should therefore have appraised the economic facts about Falstaff

---

**31.** *See generally* Handler, The Twentieth Annual Antitrust Review—1967, 53 Va.L.Rev. 1667, 1667–80 (1967).

**32.** Prior to *Falstaff*, the Court decided *Ford Motor Co. v. United States*, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972), affirming the lower court's finding that Ford Motor Company's acquisition of Autolite, a spark plugs manufacturer, violated section 7 both through vertical foreclosure and by lessening potential competition. The primary thrust of the Court's decision, however, concerns the propriety of the relief ordered in the context of the facts of that case. The *Ford Motor* decision, then, did

not particularly advance the guidelines for analysis of a potential competition case.

**33.** Justices Brennan and Powell did not participate in the *Falstaff* decision. Mr. Justice White, joined by the Chief Justice and Mr. Justice Blackmun, wrote the majority opinion. Mr. Justice Douglas concurred in that opinion except insofar as it sought to defer consideration of the status of the actual potential entrant aspect of potential competition. Mr. Justice Marshall concurred in the result, and Mr. Justice Rehnquist, joined by Mr. Justice Stewart, dissented.

and the New England market in order to determine whether in any realistic sense Falstaff could be said to be a potential competitor on the fringe of the market with likely influence on existing competition.

*Id.* at 533–34, 93 S.Ct. at 1101 (footnotes omitted).[34] Thus, even if a firm would not in fact enter a market de novo, if it is rationally perceived as capable of and likely to enter by participants in that market, entry by acquisition may be proscribed. As noted previously, in *Falstaff* the Court expressly left unresolved the validity of the actual potential entrant aspect of potential competition. *See id.* at 537–38, 93 S.Ct. 1096.

Finally, *United States v. Phillips Petroleum Company*, 367 F.Supp. 1226 (C.D.Cal. 1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974),[35] relied upon heavily by the government in this case, was decided by the lower court prior to *Marine Bancorporation*, but was affirmed by the Supreme Court subsequent to that decision. In a thoughtful and exhaustive opinion by Judge Ferguson,[36] the court found both on perceived and actual potential entrant theories that Phillips' acquisition of Tidewater Oil Company violated section 7. *See id.* at 1229, 1251, 1254, 1256. Phillips, one of the nation's largest oil producers, had acquired Tidewater, in a geographic extension merger, in order to gain entry into the lucrative California market.

In analyzing Phillips' capability to enter de novo or by toehold acquisition, the court examined Phillips' size and financial capabilities as a major oil producer, its prior history of rapid de novo expansion and diversification as opposed to growth by acquisition, its technological capabilities, its previous activities in the California market, its management and marketing expertise, its logical need for a West Coast refinery, and the successful de novo entry into the California market by another oil producer. *See id.* at 1239–42. Relying on objective evidence, the court probed Phillips' motivation to enter the market by analysis of such factors as Phillips' goal to become a nationwide marketer, its extensive prior examination of means of entry into the California market alternative to the Tidewater acquisition, its relatively cursory examination of Tidewater despite the 366 million dollar cost, the profitability of the target market, the advertising, marketing, product supply, and credit advantages accruing to a nationwide oil producer, and Phillips' ability to expand other activities (petrochemicals) complementary to those of the acquired firm. *See id.* at 1242–47.

After application of these factors and determination that Phillips had both the motivation and capability to enter the California market de novo, the court considered whether any unique features of the California market precluded Phillips' entry by internal expansion. In deciding none existed, the court relied heavily upon another oil producer's earlier de novo entry, and pointed to such factors as the approximately equal costs of entry de novo or by acquisition, and the availability of gasoline and crude oil supply, and of marketing outlets. *See id.* at 1247–51.

**34.** In a footnote the Court reiterated that direct evidence need not be produced to demonstrate an edge effect, but rather such effects can be proven circumstantially through consideration of objective factors. *See* 410 U.S. at 534–35, n.13, 93 S.Ct. 1096. *See also United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1256–57 (C.D.Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

**35.** In *United States v. Connecticut National Bank*, 418 U.S. 656, 660, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974), decided the same day as *Marine Bancorporation* and likewise a geographic extension merger, the Court remanded for redefinition of the relevant product and geographic markets. Since the case involved banking, a heavily regulated industry, and since the Court did not pursue a potential competition analysis due to the faultily defined markets, *Connecticut National Bank* does not offer further elucidation of the *Marine Bancorporation* concepts.

**36.** For a useful review of the *Phillips* decision, see *United States v. Falstaff Brewing Corp.*, 383 F.Supp. 1020, 1025–27 (D.R.I.1974), *on remand from*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973).

In determining Phillips to be a perceived potential entrant, the court noted the high barriers to entry, the fact that Phillips was the largest major oil producer not previously in the California market, and the clear industry recognition and fear of Phillips as a likely entrant. *See id.* at 1254–56. The indicia employed in *Phillips* provide useful guidance for analysis of Black & Decker's possible role as an actual and/or perceived potential entrant.

■ In a nutshell, review of prior potential competition cases suggests that the competitiveness of the market must first be determined; the feasibility of alternative means of entry to a leading firm acquisition must then be explored with reference to the incentive and capability of the acquiring company; and finally, the ability of those alternative means of entry, if any, to deconcentrate or provide significant procompetitive effects must be examined.

37. The data for the years 1973 and 1974 reflect, in part, post-acquisition evidence. Such evidence may properly be considered by a court in analysis of a section 7 suit. *See United States v. General Dynamics Corp.,* 415 U.S. 486, 504–06, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *United States v. Falstaff Brewing Co.,* 410 U.S. 526, 530 n.11, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973); *FTC v. Consolidated Foods Corp.,* 380 U.S. 592, 598, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 597–607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1252, 1260–61 (C.D.Cal. 1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

The weight to be accorded such evidence, of course, will vary with the circumstances of each case. *Compare United States v. General Dynamics Corp., supra with FTC v. Consolidated Foods Corp., supra and United States v. Continental Can Co.,* 378 U.S. 441, 463, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

38. The concentration ratios, in units, by percentage, and by year, are:

| | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|
| 2 largest Manufacturers | 54.6 | 56.8 | 54.3 | 51.7 | 48.4 |
| 4 largest Manufacturers | 71.9 | 73.2 | 77.5 | 76.7 | 75.1 |
| 8 largest Manufacturers | 92.9 | 92.5 | 93.5 | 93.8 | 92.0 |

*See* G 310A; G 311A; G 312A; G 313A; G 314A; G 315. In the same period the industry

### The Competitiveness of the Gasoline Powered Chain Saw Market

■ As provided in *Marine Bancorporation, supra,* 418 U.S. at 631, 94 S.Ct. 2856, the government has relied on the introduction of concentration ratios to create a prima facie showing that the relevant market is sufficiently concentrated to warrant application of the potential competition doctrine. In 1972, the year preceding the merger, the two largest manufacturers of gasoline powered chain saws accounted for 54.3%, in units, of the gasoline powered chain saws sold, the top four manufacturers accounted for 77.5%, and the top eight manufacturers accounted for 93.5%. From 1970 to 1974 [37] the share, again in units, for the two largest manufacturers declined overall from 54.6% to 48.4%, while the share of the four largest manufacturers grew overall from 71.9% to 75.1%. The top eight manufacturers' market share in that same period declined slightly overall from 92.9% to 92%.[38] *See* G 315.

leader's market share declined from [C.D.O.] *Compare* G 314A *with* G 310A.

Defendants assert that these ratios offer only crude indications of market structure, since they do not account for the absolute number of firms in the market or the individual distribution of market shares between these firms. *See* Jernigan Tr 1702; Epstein Tr 2558–59; *In re Litton Industries, Inc.,* FTC Docket No. 8778, Initial Hearing Decision, pp. 128–30 (Feb. 3, 1972). In lieu of concentration ratios, defendants advocate the use of the Herfindahl index, a single number on a scale from zero (deconcentration) to one (monopoly), derived from summing the squares of the market share of each firm in the industry. The Herfindahl index reflects the number of firms in a market and their relative market shares. *See* Jernigan Tr 1702; Epstein Tr 2558–63. For the years 1970–1974 the Herfindahl index, comprised of data roughly comparable to that used in preparing the concentration ratios, shows a trend to decline in concentration: 1970—.187; 1971—.188; 1972—.183; 1973—.176; 1974—.162. *See* D 555, p. 3. The critical problem with the Herfindahl index, aside from its non-recognition by courts which have uniformly used concentration ratios and its concomitant lack of comparability to data from earlier authority, is that one or two firms could have sizable market shares but if enough small, insignificant firms existed, the market could appear relatively deconcentrated. The competitive effect of these small firms might well be marginal, but

In the submarket previously defined as the manufacture and sale of gasoline powered chain saws with retail prices of less than $200, a similar picture emerges (in units, by percentage):

| | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|
| 2 largest Manufacturers | 53.9 | 48.8 | 51.9 | 49.2 | 50.3 |
| 4 largest Manufacturers | 71.8 | 69.5 | 79.4 | 79.8 | 82.0 |
| 8 largest Manufacturers | 93.9 | 91.6 | 93.6 | 95.5 | 96.0 |

See G 320; G 324; G 328; G 332; G 336.

While not of the magnitude of those held to establish, prima facie, a concentrated market in *Marine Bancorporation*, where the top three banks controlled 92.3% of the market, the above concentration ratios nonetheless suffice to evidence a heavily concentrated market and submarket, requiring a potential competition analysis. *See* 418 U.S. at 607–08 n.2, 631, 94 S.Ct. 2856.

In *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), where the Court remanded for further application of the potential competition doctrine and where the market was characterized by Mr. Justice Marshall in a concurring opinion as "highly concentrated," the top four firms accounted, at the time of the merger, for 61.3% of the market, up from 50% five years earlier, the top eight for 81.2%, up from 74% four years earlier. *See id.* at 527–28, 537, 571, 93 S.Ct. 1096. In *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1253 (C.D. Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974), where the court found the market to be "at least as highly concentrated" as the one in *Falstaff* and where the court determined the market to warrant application of the potential competition doctrine, the top two firms, at the time of the merger, controlled 39% of the market, the top four, 58%, the top seven, 81.2%.[39] Five years previously, the top two controlled 32.5%, the top four, 52%, the top seven, 79.2%. *Id.*

These figures from *Falstaff* and *Phillips Petroleum* represent significantly lesser degrees of concentration than is present in the gasoline powered chain saw market.[40] While the concentration trends

the Herfindahl index by reflecting them, could significantly distort by underestimation the market power of the leading firms.

Defendants also contend that the ratios should reflect the presence of private labellers such as Montgomery Ward and that sales by unit should be segregated by brand name. Under this theory if a chain saw manufacturer sold a unit to a private labeller, which sold under its own brand name, then the unit in determining market percentages would be credited to the private labeller. The manufacturer's market share would only reflect sales made under its own name. The recognition of the impact of private labeller sales in concentration ratios, however, would be inconsistent with the court's earlier, *supra* at pp. 737–738, definition of the market as the manufacture and sale of gasoline powered chain saws. Moreover, use of the defendants' ratios does not substantially alter the percentages involved; the four firm ratio would be 68.14% in 1974 down from 71.69% in 1970 and the two firm ratio would decline from 55.09% to 48.91% in the same period. *See* D 555; Jernigan Tr 1899–1902, 5093–94. *See also* G 412–416.

39. As noted previously, *United States v. Phillips Petroleum Company* was affirmed per curiam subsequent to the Court's decision in *Marine Bancorporation*.

40. Comparison with the concentration ratios of nonconglomerate merger cases also indicates the gasoline powered chain saw markets to be heavily concentrated. In *United States v. Aluminum Co. of America*, 377 U.S. 271, 278, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), with "highly concentrated markets," the top two firms controlled 50% of the market, the top five firms approximately 76%, and the top nine firms 95.7%. In *United States v. Philadelphia National Bank*, 374 U.S. 321, 364 n.21, 365, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), a merger was proscribed where the top two banks controlled 44% of the market's commercial banking while the top five banks controlled 78% of the market banks' assets. In *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the Court, noting the significant reduction in the number of competitors resulting from, in part, a trend to mergers, held the merger of the third and sixth largest firms in the market to violate section 7 in a market where the four largest firms had 24.4% of the market, the eight largest had 40.9% and the top 12 had 48.8%. *See id.* at 281, 86 S.Ct. 1478 (White, J., concurring).

In *United States v. Pabst Brewing Co.*, 384 U.S. 546, 551, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), where a number of relevant markets were found, the top ten brewers in the nation increased their market shares in the period

in this case have fluctuated and do not uniformly demonstrate increasing concentration (e. g., decline of two firm ratio for period 1970–1974), as the ratios in some earlier cases have done, the concentration figures are of sufficient magnitude to establish the government's prima facie case with respect to showing a concentrated market.

The burden thus shifts to the defendants to demonstrate with evidence of actual competitive market performance that these concentration ratios do not accurately reflect the competitive nature of the gasoline powered chain saw markets.[41] *See Marine Bancorporation, supra,* 418 U.S. at 631, 94 S.Ct. 2856. To this end, defendants have introduced evidence of various aspects of volatile, competitive market performance.

It is undisputed that in the years surrounding the Black & Decker/McCulloch

merger up until about 1975 demand for gasoline powered chain saws rose dramatically, with nearly threefold growth occurring between 1970 to 1974 alone.[42] *See* Straetz Tr 216, 219, 228–29; Bartelt Tr 1015, 1074–80; Deming Tr 1200–04; Jernigan Tr 1563, 1862, 5112–13; Epstein Tr 2521; G 316A; G 377 (pp. 22, 104); G 380 (p. 165); G 381 (pp. 40–41); D 256; D 548; D 743–44. Such growth is significant since it can provide incentive for new entry. *See* Jernigan Tr 1563; *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 553 (N.D.Ill.1968). Not surprisingly, then, in response to this tremendous growth, a substantial number of new manufacturing companies made de novo entries into the gasoline powered chain saw market, including Quadra Manufacturing Company, Danarm, Husqvarna, Jobu, Jonsereds, and Kioritz.[43] *See* Nolan Tr 685–87; Epstein Tr

1957 to 1961 from 45.06% to 52.60% while the top four firms in Wisconsin in the same time period increased their share from 47.74% to 58.62%. In a three-state area, the eight leading brewers increased their market share from 58.93% to 67.65%. *Id.* Citing a trend to oligopoly, the Court proscribed a horizontal merger between the country's tenth and eighteenth largest brewers, with a combined total of 4.49% of the industry's sales. See *id.* at 551–52, 86 S.Ct. 1665. Finally, in *United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), where the Court found concentration "already great," the top two firms in a broad inter-industry market controlled 48.7%, the top four 63.7%, and the top six, 70.1%. *See id.* at 461 & n.11, 84 S.Ct. 1738, *quoting United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 365 n.42, 83 S.Ct. 1715. *See also United States v. Jos. Schlitz Brewing Co.,* 253 F.Supp. 129, 136 (N.D.Cal.), *aff'd per.curiam,* 385 U.S. 37, 87 S.Ct. 240, 17 L.Ed.2d 35 (1966) (top 10 brewers control 57%, top 25, 82%); *Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 73 (10th Cir. 1972), *cert. denied,* 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974) (top four control 29.2%, top eight control 39.7%; top firms experiencing disproportionate growth); *United States v. Amax, Inc.,* 402 F.Supp. 956 (D.Conn.1975), *reported in,* BNA, ATRR (No. 738–11/11/75) ("oligopolistic industry"; top four controlled 66.9%, top eight, 89.9%).

41. Defendants stress that the government has failed to produce evidence of any interdependent or parallel behavior in the market or of the market firms' capacity to determine price and total output. The government's concentra-

tion ratios here shift the burden to the defendants to demonstrate the absence of such practices. *See United States v. Marine Bancorporation,* 418 U.S. at 631, 94 S.Ct. 2856. *See generally United States v. Aluminum Co. of America,* 377 U.S. 271, 280, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964).

42. From 1965 to 1974, demand in unit sales grew from 400,000 units to greater than 1.8 million units. *See* D 548.

43. At least ten new manufacturers have entered the chain saw market since 1960. *See* D 538.

A number of firms which buy gasoline powered chain saws from manufacturers and then retail them under a private brand name have also entered the market since 1960. Such companies include Tilton, Scotsco, J. C. Penney, John Deere and Allis-Chalmers. *See* D 538; Jt 4; Jt 9; Jt 28; Jt 32; Jt 43. *See also* G 377 (pp. 91–92); G 378 (Part II, p. 95).

Beginning earlier but continuing through the period of these new entries, a group of firms which had purchased their gasoline chain saw engines from gas engine manufacturers and then assembled a finished product left the chain saw market. Such firms included Disston, Terrill, Monark, Tubesing, Mono, Whitehead, Hoffco, and Indian. *See* Bartelt Tr 1067–68; D 538. The exit of these firms, however, suggests the competitive market mechanisms to have been functioning properly. The assemblers left the market since the gasoline chain saw manufacturers had made significant product improvements, discussed *infra* ; this rapid

2539–49; G 379 (pp. 213–14); D 538; D 556; D 990 (p. 18); Jt 17–19; Jt 29; Jt 32; Jt 37; Jt 43. This introduction of new firms and fluid condition of market entry and exit can indicate competitive behavior. *See United States v. Hughes Tool Co.*, 415 F.Supp. 637 at 643–644 (C.D.Cal.1976); *Beatrice Foods Co.*, [1970–1975 Transfer Binder] Trade Reg.Rep. ¶ 20,212, p. 22,113 (FTC 1972).

A number of these new entrants and the smaller firms in the market multiplied their unit sales and two of the new entrants were among the top ten firms in the market by 1974. *Compare G 310A with 314A. See also* Straetz Tr 190–91; McCallister Tr 914–15; Bartelt Tr 1072–77; Deming Tr 1144, 1201–05; D 245; D 255; D 1053; D 1055. Their growth and increase in market share help to explain the loss of market share and less rapid growth by the largest manufacturers in the market, including McCulloch.[44] *See* note 38 *supra*; Straetz Tr 190–91; Epstein Tr 2705; Nodar Tr 3716–18; Lehman Tr 4630–32; G 310A–314A; D 555; D 981; D 983.

While the market shares of the top two manufacturers did decline appreciably between 1970 and 1974 in both the market and submarket, and the share of the top eight manufacturers declined slightly in the same period, no clear trend to deconcentration stemming from the new entrants has emerged. Rather the new entrants have expanded their small market shares but

these shares remain slight compared to those of the larger firms. *See* G 422. The two new entrants in the top ten manufacturers, [C.D.O.], had market shares in 1974 of 2% and 1.8% respectively.[45] In fact [C.D.O.] which had entered the market by acquisition in the late 1960's had less than a 5% market share in 1974. *See* G 310A; G 422. Realistically, these new entrants, despite rising demand, had not at the time of this suit significantly deconcentrated the market or established a trend toward such deconcentration. See Jernigan Tr 5108–11, 5114–15, 5122–23. *See generally Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 73 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974).

■ The number of new entrants also does not belie the substantial entry barriers characteristic of the gasoline powered chain saw market which are another aspect of market analysis. *See United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 164, 175, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *Brown Shoe Co. v. United States*, 370 U.S. 294, 322, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. Amax Inc.*, 402 F.Supp. 956 (D.Conn.1975), *reported in* BNA, ATRR, (No. 738–11/11/75). To be discussed more fully *infra* in analysis of the actual potential entrant claim, the design and sale of a gasoline powered chain saw entails subtle calculations of two cycle engine design and demands considerable technical and manu-

---

technological evolution could not be matched by the gas engine manufacturers, and thus, for reasons of product inferiority the assemblers were forced to abandon the market. *See* Epstein Tr 2540–41.

**44.** One new entrant, [C.D.O.], quintupled its market share between 1970 and 1974; another entrant, [C.D.O.], between 1973 and 1974 more than tripled its market share; another entrant, [C.D.O.], also tripled its market share in the slightly longer period of 1972 to 1974; and finally, another new entrant, [C.D.O.], while increasing its unit sales fourfold, doubled its market share. *See* G 310A–G 314A; [C.D.O.] Cumulatively, these gains, coupled with small incremental gains made by other firms in the market, resulted in the reduction of the top two and the top eight manufacturers' market shares

between 1970 and 1974. *Compare* G 310A *with* G 314A.

**45.** The relatively insignificant market share attributable to the new entrants and the smaller firms can best be illustrated by the following industry ranking:

United States (in Units)
of Gasoline Powered Chain Saws by Manufacturer: 1972

| Company | Percent of Total |
|---|---|
| [C. D. O.] | |
| | TOTAL 100.0% |
| | Source: G 312A |

facturing expertise. *See, e. g.*, Decker Tr 2898–2904; Graham Tr 3433–36; D 848–914; D 989 (pp. 32–34, 47–48, 55, 65). Moreover the state of the two cycle gasoline engine art was evolving rapidly in the early 1970's and this dynamism presented additional problems for new entrants. *See* Graham Tr 3417–20A, 3484–85; D 848–914. The firms that did enter the United States market in this period tended to be foreign chain saw manufacturers or companies with prior gasoline engine experience. D 538. *See, e. g.*, Jt 18; Jt 19; Jt 27.

The ability to obtain marketing outlets, again a factor to be analyzed *infra* in the actual potential entrant discussion, also constituted an entry barrier in the nation's gasoline powered chain saw market. *See* Straetz Tr 161. In addition to establishing a broad based marketing system that could reach the various groups of chain saw buyers including the expanding occasional user segment, a new firm in the market would also have to create an extensive service network to support its chain saw sales. *See id.* at 162; Bartelt Tr 1009, 1012–13; Ronconi Tr 3813–21; G 379 (pp. 37–38); D 323, p. 10. Relatedly, lack of brand name awareness can hinder a new entrant's establishment of a marketing and distribution system. *See* Bartelt Tr 1020–26.

Advertising represented another, although less significant, entry barrier in the gasoline powered chain saw market. While defendants sought to prove that advertising was not a substantial impediment to growth by suggesting that firms with below average advertising expenditures grew faster than firms with greater expenditures, the evidence was not persuasive. *See* D 542. In terms of unit sales between 1972 and 1974, a group of 12 firms grew 94.6% with an advertising to sales ratio of $1.77 while a group of 11 firms in that period with a growth rate of 71.7% had an average advertising to sales ratio of $8.19. Two aspects

of the data underlying these figures defeat the inference defendants would have the court draw. First, seven of the 12 firms in the initial group suffered unit sales declines in this period, while only one of the firms in the latter group experienced declining unit sales. *See* Jernigan Tr 5052–57; G 410. More significantly, the firms included in the first group are, without exception, the smallest firms and thus are the ones in the easiest position to multiply their market shares. *See id.* Defendants' proof, far from suggesting advertising to be inconsequential, in fact indicates advertising to have significant impact on product sales. *See generally* G 309. This conclusion accords with common sense especially when the increasingly consumer oriented nature of the gasoline powered chain saw market is recalled.[46] *See* Straetz Tr 137–38, 145; McCallister Tr 825–29; Jernigan Tr 1586–7, 1895; G 21, pp. 11–13; G 309; G 377 (pp. 26–27).

Apart from its role as an entry barrier, advertising has further relevance, according to the defendants, to analysis of competitive market performance. Defendants seek to dichotomize informative, pro-competitive advertising and less competitive, economically wasteful, image advertising and suggest the former characterizes advertising in the gasoline powered chain saw market. *See* Epstein Tr 2449–50, 2493–95. It is true that some chain saw advertising does relate such useful information as price, weight, and the types of trees suitable for the product, but the line between image and informative advertising is not as clear as defendants suggest. *See* D 509; D 509A; D 533; D 563. Moreover, even granting that chain saw advertising is relatively informative, this factor seems to relate less to any competitive aspect of the market than to the type of product involved. Unlike a low price product which is physically indistinguishable from its competitive equivalent and which must rely on image advertising

---

**46.** The shortage of raw materials has also been suggested to be a barrier to entry in the gasoline powered chain saw market. *See* G 377 (pp. 113–14); G 378 (Part II, p. 91). There has been no showing, however, that these shortages were either pronounced or permanent and thus, they do not appear to have posed significant difficulties for new entrants.

for distinction, more expensive chain saw models differ in the variety of features offered and may be differentiated by informative advertising. *See* Jernigan Tr 5059–63; D 562. *See generally FTC v. Procter & Gamble Co.*, 386 U.S. 568, 572, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. Lever Bros. Co.*, 216 F.Supp. 887, 893 (S.D.N.Y.1963).

In realizing and expanding market shares, the new firms entering without acquisition have indisputably added production capacity and product supply to the gasoline powered chain saw market. *See* Defendants' Proposed Finding of Fact & Conclusions, ¶ 152. Moreover, existing firms have increased plant capacity.[47] In so doing, both the new and existing firms appear to have responded competitively to the rise in consumer demand since this increased supply of goods encourages lower prices. *See* Epstein Tr 2521.

The gasoline powered chain saw market's clear record of product innovation and improvement also tends to indicate competitive performance. *See United States v. Falstaff Brewing Corp.*, 383 F.Supp. 1020, 1023 (D.R.I.1974), *on remand from* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). Through its history the industry has witnessed the repeated introduction of smaller, lighter weight, and lower priced chain saw models with improved safety features that broadened the product's appeal from the professional logger to include farmers and homeowners.[48] *See* Straetz Tr 119–20, 124–26, 130–34, 136, 140–42, 187, 230; Nolan Tr 537, 557, 692; Epstein Tr 2406, 2452, 2475–77, 2480–83; Jernigan Tr 5223; G 377 (pp. 110–11, 167–68); D 531; D 532; D 535; D 989 (pp. 204–05). This expanded appeal, in turn, increased demand for the product. The product innovation in the gasoline powered chain saw market resulted from a strong industry commitment to research and development.[49] *See* Jernigan Tr 5223.

The impact of the private label sellers such as Sears & Roebuck and Montgomery Ward is also said to promote competitive market performance. By exercising significant buying power through their large purchases from relatively small gasoline powered chain saw manufacturers, these sophisticated purchasers, defendants contend, have encouraged lower prices. *See* Epstein Tr 2550–54; Jernigan Tr 1897–99. *Cf. United States v. Hughes Tool Co.*, 415 F.Supp. 637 at 644 (C.D.Cal.1976). The suggestion is that private label accounts are so critical to a small firm's survival that, for accommodation, the small firms will pass along volume discounts to their private labeller customers. These savings in turn may be passed on to the ultimate purchaser. Downward price pressure further results, defendants argue, when private labellers price saws lower than do the manufacturers for the equivalent model. *See* Epstein Tr 2514–16; D 564A. Additionally, private labellers with their large and concentrated purchases are said to afford new firms the possibility of rapid growth, thereby lessen-

---

47. In the 1973–1974 period Beaird-Poulan added new capacity in Shreveport, Louisiana. *See* G 377 (p. 121); Straetz Tr 192. In recent years, Homelite, an industry leader, has repeatedly expanded production capacity. *See* Straetz Tr 194–98; D 622. DESA also increased production capability without the addition of new facilities. *See* Deming Tr. 1201. Lombard expanded its capacity as well. *See* Epstein Tr 2522. Additionally, manufacturers increased their foreign capacities, which expansion had the effect of increasing product supply in the United States. *See* Straetz Tr 192–93 (Stihl); Bartelt Tr 1047–48 (Kioritz); Epstein Tr 2522–23 (Roper, Quadra, Husqvarna); G 378 (pp. 86–88) (Roper); D 544 (Kioritz).

48. The new product characteristics and improved safety features included anti-vibration devices, better mufflers, and automatic oilers. *See* Epstein Tr 2482–85, 2728–29; D 532; D 535. Also, the introduction of such features precipitated industry competition to offer similarly improved products. *See* Epstein Tr 2478–81; D 532; D 535; D 541.

49. While conceding the product innovation to result from research and development, the government argues that the degree of product innovation is more a function of technological opportunity than it is indicative of a competitive market. *See* Jernigan Tr 1724–25; Plaintiff's Post Trial Brief, p. 32. Undoubtedly certain markets because of the technologies involved offer greater possibility for product innovation, but to the extent the market is not competitive, it will not develop fully those opportunities in whatever degree they exist.

ing entry barriers. *See* Epstein Tr 2550–54, 2711.

With respect to the first claimed pro-competitive effect of volume discounts being passed along to the private labellers and thence to ultimate purchasers, there is no direct evidence. There is evidence, however, that the private labellers did encourage lower prices. Sears & Roebuck was recognized as pricing 10–15% below the rest of the market for equivalent models. *See* D 686, p. 3. *See also* G 378 (Part II, p. 54); D 564A. In certain instances the private labellers did apparently retail gas chain saws at prices below those of the manufacturers.[50] More significantly, the private labellers offer an opportunity for growth to their suppliers. *See, e. g.*, Bartelt Tr 1014–20; Jt 9, pp. 3–8; Jt 29, pp. 2–3; Jt 31, pp. 2–3. *See also* Epstein Tr 2553–54; Jernigan Tr 5236; Jt 10; Jt 19; Jt 47.

While not discounting these beneficial effects entirely, and while recognizing that the number of private labellers in the market has grown significantly in recent years, the court believes the impact of the private labellers on the gasoline chain saw market to be questionable. *See* Epstein Tr 2539–44; G 377 (p. 92); D 538; D 556. Despite their rise in absolute numbers, the private labellers accounted for only about 15% of the sales in the gasoline powered chain saw market in the years 1970 to 1974. *See* G 417–421. Moreover, there is no discernible trend to increased market share being held by the private labellers. *See id.*; Jernigan Tr 1632. Even taking into account that these sellers concentrated their purchases with a few relatively small suppliers and thereby increased their impact, it is far from clear that these actions had a substantially procompetitive effect on the gas powered chain saw market. Of course, their impact, even if not decisive, is to be considered in conjunction with other attributes of competitive performance in the overall market analysis.

Price competitiveness is one of the most reliable indicators of desirable market behavior. Without doubt, the average prices paid for gasoline powered chain saws have decreased markedly in the last ten years. *See* Straetz Tr 158, 217; Nolan Tr 557; Epstein Tr 2454–55, 2475; G 75; G 377 (pp. 54, 111); G 379 (p. 207); D 534; D 989 (pp. 204–05). The impact of this average price decline is clouded, however, since it results primarily from the expansion of the gasoline powered chain saw market into the occasional user segment where smaller, lower priced products are offered. *See* Straetz Tr 140–42; Nolan Tr 557–59; G 75; G 377 (pp. 207–08). Price competitiveness in the nature of introducing new, lower priced models clearly existed. *See* Straetz Tr 140–42; Nolan Tr 551. It is not clear, however, that in terms of constant dollars there was a continuing price competition which was pervasive. There is evidence Skil decreased the price of a couple of its models and that Kioritz recommended retail price decreases to its distributors. *See* McCallister Tr 942–43; Bartelt Tr 1083–86; D 737; D 1050. Yet there is also evidence of increasing model prices. *See* G 377 (p. 166); D 566–67; D 990 (pp. 43–44). For the period 1973 to 1974 a study of gasoline powered chain saw pricing indicated that seven models had decreased prices, 19 models had maintained the same price, and over 90 models had increased prices. *See* Epstein Tr 2819–21; D 566–67. *See also* G 411. The effect of inflation further complicates analysis of the possible price competitiveness of the market, since maintaining or even slightly increasing prices in an inflationary period may be tantamount to price decreases. *See United States v. Falstaff Brewing Co.*, 383 F.Supp. 1020, 1023–24 (D.R.I.1974), *on remand from* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). Thus, while gasoline powered chain saw manufacturers were adapting their product line by introducing smaller, lower priced models in order to capture a share of the occasional user sub-

---

**50.** *See* Epstein Tr 2514; D 564A. [C.D.O.] unclear. The extent of such undercutting is, however, unclear.

market, no overall market pricing competitiveness clearly emerges.

As the foregoing analysis demonstrates, various facets of competitive performance in the gasoline powered chain saw market offer conflicting indications. The market was a rapidly growing one that had attracted a number of new entrants, notably foreign gasoline powered chain saw manufacturers, While these entrants enjoyed significant growth, their arrival provoked no discernible trend to deconcentration, and, in fact, their market share remains low. Moreover, significant technological barriers to entry exist; marketing, servicing and advertising also pose problems for a new entrant. Yet the market has been characterized by aggressive product innovation as well as by the expansion of production facilities.

█ Given the lack of any trend to deconcentration, the high levels of concentration that characterized both the gasoline powered chain saw market and the occasional user submarket, the relatively significant entry barriers and the lack of clear price competitiveness, the court believes that defendants have failed to meet their burden to establish that the concentration ratios and structural analysis introduced by the government "did not accurately depict the economic characteristics" of the market. *United States v. Marine Bancorporation,* 418 U.S. 602, 631, 94 S.Ct. 2856, 2875, 41 L.Ed.2d 978 (1974). *See id.* at 624, 628 & n. 32, 94 S.Ct. 2856; *United States v. Continental Can Co.,* 378 U.S. 441, 461–62, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. Aluminum Co. of America,* 377 U.S. 271, 278–79, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *Brown Shoe Co. v. United States,* 370 U.S. 294, 322, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1253 (C.D.Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974). Certainly there has been no evidence of any factor as pervasively influencing the mar-

ket as did the availability of coal reserves and the importance of long range contracts in *United States v. General Dynamics Corp.,* 415 U.S. 486, 499–504, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). The court holds then that the gasoline powered chain saw markets involved in this case are concentrated and are suitable for application of the potential competition doctrine.

*Actual Potential Entrant Claim*

*Feasible Alternative Means of Entry.*

█ In exploring the feasible means of entry alternative to the challenged acquisition, the court must analyze the incentive and capability of the acquiring firm to enter the relevant market either de novo or by toehold acquisition. *See United States v. Marine Bancorporation,* 418 U.S. 602, 633, 642, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Phillips Petroleum Corp.,* 367 F.Supp. 1226, 1239–51 (C.D.Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

The evidence discloses that Black & Decker clearly had ample incentive to enter the gasoline powered chain saw market. As noted earlier, Black & Decker for at least a decade preceding the merger had enjoyed substantial growth, at an average of approximately 15% per year. *See* G 120, p. 3; G. 121, p. 2; G 122, p. 2; G 123, p. 2; G 124, p. 2; G 125, pp. 2, 4; G 167, p. 2; G 175, pp. 2–3; G 178, p. 3. This rapid growth distinctly characterized the company, and, without question, Black & Decker's top management was firmly committed to achieving similar growth gains in the future. *See* G 123, p. 2; G 124, p. 2; G 168, p. 10; G 178, pp. 3–7. By the late 1960's and early 1970's its management became increasingly aware that the United States market for portable electric tool products was maturing and, in fact, reaching the saturation level where the majority of sales would be of replacements.[51] *See* Graham Tr 3368–69, 3380; Lucier Tr. 3509; G 209.

---

51. Saturation in the portable electric power tool industry apparently occurred in the 1974–1975 period. *See* Lucier Tr 3542–43.

In order to sustain its growth rate and maintain its healthy corporate condition, Black & Decker began to examine diversification opportunities. *See* Graham Tr 3369; G 209. Previously Black & Decker had diversified almost exclusively through internal expansion and through the introduction of new electric tool products.[52] *See* G 125, p. 7; G 172 (Part I, p. 6, Part III, p. 9); G 174 (Part I, pp. 3–5). The company had a definite, if unwritten, policy known to its employees of discouraging growth by acquisition. *See* Deming Tr. 1259–63; Graham Tr 3401–02.

 In response to the impending saturation of the portable electric tool market in the United States, Black & Decker created in August or September 1972 a new business group of some of its top level executives whose responsibility was to identify growth opportunities for the company and whose options, significantly, included internal expansion or acquisition.[53] *See* Graham Tr 3399–3400A; Lucier Tr 3509–11; Karkow Tr 3559; G 208; D 924. Formation of the group, the group's top level membership, and the allowance of the possibility of acquisition all suggest the high priority Black & Decker attached to main-taining continued growth and to diversification. This commitment to diversification is an important factor to be considered in analyzing Black & Decker's desire to enter a particular market. *See FTC v. Procter & Gamble Co.,* 386 U.S. 568, 580, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

In searching for a "new core" opportunity[54] for the company that could provide an adequate technological base for expansion, the new business group began in early 1973 intensive examination of a swim tow device, powered by a two cycle gasoline engine and manufactured by a Rockwell subsidiary, JLO, that towed a swimmer through the water at low speeds. *See* Graham Tr 3414–16; Lucier Tr 3512–13; Nodar Tr 3705–10; D 55. Black & Decker also studied entry, either de novo or by acquisition into both the gasoline powered lawn equipment market, especially the gasoline lawn mower segment, and the gasoline powered light construction equipment market. *See* G 214–24; G 229–58; G 262. Gradually, a "gas strategy" evolved whereby gasoline powered products were considered as potential "new core" opportunities. *See* Lucier Tr 3521–22; G 209; G 280, p. 38; G 285 ("Summary," p. 1).

**52.** Since 1960, and exclusive of McCulloch, Black & Decker has made only three minor acquisitions. DeWalt, Inc., manufacturer of stationary woodworking and metalworking equipment, was acquired in 1960; Carbide Router Company, purchased in 1970, manufactures carbide tipped router bits; and Wisconsin Knife Works, Inc., also purchased in 1970, manufacturers, among other items, shapper knives, shapper steel and high speed steel router bits. *See* G 109. Essentially the latter two companies have operated as accessory subsidiaries to Black & Decker. *See id.* The total cost of these acquisitions was approximately 8.4 million dollars to a company with assets of 273.6 million dollars in 1972. *See id.;* G 124, p. 10.

**53.** Earlier in 1970 the company had appointed a vice president, John Graham, to investigate the United States economy for possible growth areas, which subsequently were identified. *See* Graham Tr 3370–73. In this search Graham sought a "new core" opportunity, one sufficiently separate from Black & Decker's current product line as to be insulated from problems of rapid market saturation. *See id.* at 3380–86.

After focusing in 1971 on recreational vehicles as a promising growth area, Black & Decker rejected this diversification prospect since the manufacture of such vehicles too heavily depended on purchases of major components from other companies. *See id.* at 3386–90. At this point Graham and another Black & Decker vice president identified a number of growth areas in the United States economy which, while supplying a "new core" opportunity, were not completely beyond the management experience of Black & Decker. *See id.* at 3394–97. While these growth areas were being identified, or shortly thereafter, the new business group was formed. *See id.* at 3398.

**54.** *See* note 53 *supra.* A "new core" opportunity, unrelated to Black & Decker's current products, was not supposed to utilize the company's brand name, distribution, advertising, research and development or manufacturing expertise. Yet at least two of the products studied as potential "new core" opportunities, including the gas chain saw, were described as "proximat[e]" to Black & Decker products. *See* Lucier Tr 3531; G 280, pp. 28, 39.

Through its investigation of the swim tow device and other products powered by the two cycle gasoline engine, the new business group became seriously interested in the gasoline powered chain say by at least early 1973. *See* Lucier Tr. 3513; Nodar Tr 3739, 3741–43. In the early 1970's the demand for that product had increased dramatically, with overall industry sales growing, on an average, in excess of 25% per year.[55] *See* G 316; G 316A; D 548; D 724. Moreover, Black & Decker itself predicted that the growth would continue at approximately 20% per year for the next five years. *See* G 285 ("Summary," p. 1). *See also* G 279. The company also recognized that in 1971 electric and pneumatic power products accounted for only 36% of the total power products market; gas accounted for the remainder. *See* G 280, p. 34. Given Black & Decker's growth objectives and its maturing electric markets, the attractive increase in sales, known to Black & Decker, of gasoline powered chain saws clearly constituted an important incentive for entry. *See United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1245 (C.D.Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 77 (10th Cir. 1972), *cert. denied,* 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 561 (N.D.Ill.1968); *United States v. Crocker-Anglo Nat'l Bank,* 277 F.Supp. 133, 190 (N.D.Cal.1967).

Black & Decker's thorough and continuing investigation of the gasoline powered tool market generally further indicates its strong desire to enter the gasoline powered chain saw field. The products most extensively studied were, as mentioned previously, gasoline powered lawn mowers, gasoline powered light construction equipment, and gasoline powered chain saws. Starting at least in 1969, Black & Decker staff considered various gasoline engines and their possible product application. *See* G 210–14. Attention focused on developing a gas lawn mower, to supplement Black & Decker's rapidly growing electric sales in that area. *See* G 110A; G 177 (Part II, p. 7); G 214–16; G 380, p. 51. Three avenues of entry into the gas lawn mower field were explored: internal expansion, purchase or sourcing of gasoline engines from another company, or acquisition. *See* G 216–17. Throughout the early 1970's Black & Decker staff actively pursued and further analyzed the possibility of adding a gas lawn mower to the Black & Decker line. Such data as the costs for sourcing the gas engines, market statistics, product analysis, and engine analysis were developed. *See* G 219–24; G 231–37; G 240–47; G 252. Marketing of a gasoline lawn mower was originally projected for the 1973 season; subsequently, the gas lawn mower project was converted into a long range product plan with the goal of producing a superior gas product. *See* G 230; G 250. While Black & Decker has not yet apparently marketed a gas lawn mower, its perception of that product as a logical extension of its current product line and its intensive investigation suggest a deepening interest in gas products.

Beginning in 1972 and extending beyond the date of the Black & Decker/McCulloch merger, gasoline powered light construction equipment was also explored as a possible means of product diversification. Included in this category were gas chain saws, which Black & Decker personnel recognized as having a "healthy" growth rate. *See* G 254; G 256–57. As with gas lawn mowers, Black & Decker staff proposed consideration of entry into the gasoline powered light construction equipment market through such avenues as internal expansion, sourcing of the engine, and acquisition. *See* G 256. Again, this interest indicates a growing company awareness of the attractions of gas powered products.

55. The growth in certain subsections of the gasoline powered chain saw market was even more pronounced. Between 1970 and 1974 gasoline powered chain saws retailing for less than $140 increased over 700% in unit sales; unit sales of saws retailing for less than $170 increased over 600%; and for saws selling for under $200, the growth rate exceeded 230%. *See* G 339–41.

From 1970 Black & Decker collected data concerning both electric and gas chain saws. *See* G 264–65; G 275. Market and product analyses and forecasts were made and acquisition candidates were suggested as was sourcing the gasoline engines. *See* G 270–76. In January 1973, the Home Products Division of Black & Decker issued a product development request for a gasoline powered chain saw with the recommendation that the engine be sourced. *See* G 277. Shortly thereafter in April 1973 the new business group presented to the Black & Decker Board of Directors a report on new product development that included an analysis of the gasoline powered chain saw market. *See* G 280, pp. 16–21. Entry into the gas chain saw market was proposed through sourcing of the engine or through acquisition. *See id.* at 20. Even prior to this presentation in February 1973, the new business group had, through Black & Decker's investment bankers, Lehman Brothers, contacted potential acquisition candidates including McCulloch and Rockwell's JLO division. *See* G 282–83. This chronology leading to the McCulloch acquisition evidences a continued and serious interest by Black & Decker in the gasoline powered chain saw market.

Black & Decker clearly desired, then, to enter the gas chain saw field. Its various investigations of gas products, including the chain saw, and more significantly, the expanding gas chain saw market are factors indicating its motivation for entry.

The company's capabilities, however, limited the possible avenues of such entry.

While the company's prior largely de novo expansion history might suggest similar entry into the gasoline powered chain saw field, a number of obstacles effectively foreclosed this possibility. *See United States v. Marine Bancorporation,* 418 U.S. 602, 642, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1239–40 (C.D.Cal. 1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

Most importantly, Black & Decker lacked the expertise in gasoline technology necessary for a successful de novo entry. In its history Black & Decker has never manufactured or developed internally a gasoline engine.[56] *See* Sublett Tr 378; Decker Tr 2876; G 108; G 135–66. Rather the thrust of its product diversification has been in the evolution of new applications for electric motors.[57] *See* Decker Tr 2863–76, 2881; D 923. The dichotomy between gas and electric technologies is underscored by the fact that no electric tool company has ever entered the gasoline powered chain saw market by internal expansion.[58] *See* McCallister Tr 925; Decker Tr 2935–36; D 538.

The reasons for this dearth of de novo entrants from the electric tool products field are not difficult to discern from a technological viewpoint. Design and development of gasoline and electric powered products entail different considerations. The two cycle gasoline engine, power source for gasoline chain saws, presents many difficult and unique design problems such as scavenging, cylinder cooling, combustion theory, vibration and noise control, exhaust

---

**56.** As noted previously, Black & Decker does sell a small gasoline powered generator, the engine for which is sourced from another company. *See* G 348.

**57.** An attempt to transfer Black & Decker's design and manufacturing expertise to its air tool operations, developed by acquisition, resulted in failure. *See* Decker Tr 2875–76, 2932–33.

**58.** In the 1950's the Porter Cable Company, an electric tool company since absorbed by Rockwell, attempted to enter the gasoline chain saw field de novo. The company encountered numerous design problems including piston fail-

ure, component deterioration, engine overheating, vibration and cost control. By the time Porter Cable had resolved these difficulties and begun marketing a gasoline powered chain saw, the product was obsolete. In 1961, the company abandoned the project. See Graham Tr 3343–3358.

Skil Corporation manufactures both electric tools products and a gasoline powered chain saw. Entry into the latter field, however, was accomplished primarily through merger with Power Machinery Ltd., and not through internal expansion. *See* Kaman Tr 726, 764–65; McCallister Tr 925.

clogging, air cooling, pollution, lubrication, carburetion and ignition.[59] *See* Straetz Tr 255, 257; Decker Tr 2902–04; Shaeffer Tr 3017–21, 3028–29, 3031; D 989 (pp. 31–34, 40–45, 47–48, 84–87, 90–92, 95–96); D 1078 (Chart 18). *See also* Weiss Tr 4984. In contrast, the principal concerns in designing electric tool products are winding design, commutation, wire and brushes, insulation, speed and direction control, cooling, radio and television interference and electric safety.[60] *See* Decker Tr 2882, 2895–97; D 1078 (Chart 18). The technologies, expertise, and engineering skills necessary for development and design of these two types of power products thus differ substantially.[61]

The intricacies of two cycle gasoline chain saw engine design and manufacture are reflected in the numerous problems encountered by companies in the market. [C.D.O.] O & R, a small gas chain saw manufacturer, had saws returned because of carburetion and heat problems and in fact its plant was shut down for six weeks to correct manufacturing defects. *See* Nolan Tr 604–09, 619–23.

The extensive time necessary to develop gasoline powered chain saws by companies knowledgeable and active in the field further corroborates the technical sophistication involved. Desa's Mighty Mite model was in development for approximately two years prior to its introduction despite the fact that Desa had acquired gasoline chain saw expertise through its earlier acquisition of Remington's chain saw operations. *See* Sublett Tr 380–82. O & R's first chain saw model took 18 months to develop. *See* Nolan Tr 537–38, 583. Skil, another company that had acquired chain saw expertise by acquisition, took two years to develop its 2.1 cubic inch saw. *See* Kaman Tr 743, 765–67. *See also* D 731 (2½–3½ years development projected for a heavier saw). Two of Beaird-Poulan's models took a similar length of time to develop. *See* G 377 (pp. 97–98). Henry Hutchison of the Quadra

**59.** The gasoline, internal combustion engine functions through the mixture of oxygen with fuel being ignited by a spark plug in a relatively confined space. The engine creates a series of timed explosions that drive a piston and a crank assembly to perform useful work. Briefly, the two cycle gasoline engine operates by fuel being inducted into the crankcase whence it is transferred into a transfer port and up into a cylinder. In so doing previous exhaust gases are forced out the exhaust. Compression then occurs with the crank pushing the piston up into the cylinder and the gases being compressed to the maximum. The spark is then introduced and the controlled explosion results. The explosion causes the gases to expand which expansion forces the piston downward, thereby creating usable energy and opening the exhaust port to allow the spent gases to exit. As the piston was rising to compress the gases it created a partial vacuum in the crankcase. That area is filled with a new gas and oxygen mixture which is forced upward by the piston as it is driven by the controlled explosion of the previous gas and oxygen mixture. The process of replacement of the exhaust gases with a fresh charge of gas and oxygen is known as scavenging. *See* Decker Tr 2898–2901; D 989 (pp. 18–30); D 1078 (Charts 13–17); Sublett Tr 331–32. *Compare* note 60.

**60.** The universal electric motor, used almost exclusively by Black & Decker in powering its products, involves utilization of electromagnetics which results from combination of electric and magnetic circuits. The electric circuit is generally copper or aluminum and the magnetic circuit is either iron or steel. Electric current running through coils (both fixed and moving) produces lines of magnetic force that through iron laminations can be focused to harness and amplify the energy produced. Shaping the iron core into a horseshoe concentrates the magnetic field in the gap. Next a wire with current flowing through it is wound around the iron coil with the effect of producing a magnet that tends to move the wire, thereby yielding mechanical force. Through more sophisticated technology a current carrying coil is placed in the gap of the iron core, and by reversing the current through use of a commutator, continuous rotation is achieved. Thus, by introduction of electricity into a fixed magnetic field, coils are made to repel, creating usable energy. *See* Decker Tr 2883–97; D 1078 (Charts 2–13).

**61.** Ford Motor Company which has extensive knowledge of four cycle gasoline engines invested in a small two cycle gasoline chain saw manufacturer, O & R, in order to rectify its lack of expertise in the area. *See* Weiss Tr 4984. That two cycle gas engine technology is perceived as recondite by a company such as Ford suggests the magnitude of the subtleties unique to two cycle gas engine design.

Corporation estimated that it would take 24 to 30 months to develop a gasoline chain saw with prior experience and three to five years without such experience. *See* G 379 (pp. 148–49, 255–56). *See also id.* at 12–30; D 989 (pp. 105, 244); D 990 (pp. 19–21). Finally, Homelite, an industry leader with a long history of chain saw manufacturing expertise, took three years to design and develop its Model 350, three and a half years for its Model 450, and just short of two years, drawing on prior experience, for its Model XL–2. *See* Shaeffer Tr 3033–36, 3102–03; D 538. The development times assume added significance in light of the forecast of five years for the chain saw market's expansion. *See* G 285 ("Summary," p. 1).\*

The rapid pace of technological progress compounds the difficulties inherent in two cycle gasoline engine design and diminishes the prospects for de novo entry.[62] *See* Graham Tr 3417–21, 3484–85; D 673; D 848–914. By the time technological innovations were made public, they were already several years old and did not represent the current state of the art. *See* Graham Tr 3484–85.

The government argues that gasoline powered chain saw expertise, to the extent Black & Decker lacked it, was available for hire. The availability of such engineering expertise is not clear from the record. *Compare* Straetz Tr 159–60; Nolan Tr 555–56; Kaman Tr 754–56; G 378 (pp. 24–27); G 379 (pp. 125–26), *with* Straetz Tr 210; Shaeffer Tr 3086; Weiss Tr 5005–06. Moreover, even were such expertise available, a significant period of time, probably several years, would be necessary to design and develop a gasoline powered chain saw to the then current state of the art. Design of gas saws requires extensive empirical research which cannot be bypassed through reference to engineering texts and the like. This process of trial and error, even with competent personnel, is a gradual one of refinement. The rapidly advancing gasoline technology would further hamper quick

product development and market entry. *See* Graham Tr 3483–89. Even if possible, hiring of competent gas personnel would likely not produce successful and reasonably timely de novo entry.

The government also suggests as factors favoring de novo entry that gas chain saws largely consist of purchased parts and that design assistance was available from the vendors of these components. Unquestionably, purchased parts, such as saw chain, spark plugs, ignition systems and carburetors, form a significant portion of a finished gas chain saw. *See* Sublett Tr 333–39; Nolan Tr 538; G 104–07; G 377 (p. 32). In the design of these parts and others, component vendors can supply useful expertise. *See* Sublett Tr 334–36; Nolan Tr 538–39, 547, 717; G 379 (pp. 26–28). Vendors, however, merely supplement a company's expertise and are not a surrogate for in house engineering capability. Rather the vendor and the manufacturer collaborate, with the manufacturer usually supplying the initial design for vendor modification. *See* Sublett Tr 340, 343; Nolan Tr 538–39; Shaeffer Tr 3042–43; G 378 (pp. 52–53).

In sum, neither the possibility of hired gas expertise, nor the high purchased content of gas chain saws nor the availability of vendor assistance nor the combination thereof suffice to overcome Black & Decker's technical incapability to design and develop a gasoline powered chain saw de novo. Simply stated, Black & Decker's considerable but narrow electric expertise did not pertain to the development of a two cycle gasoline powered product and therefore precluded de novo entry. *See* Graham Tr 3540. *Cf. Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 77 (10th Cir. 1972), *cert. denied,* 416 U.S. 909, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

The dissimilarity between the manufacturing of portable electric tool products and of gasoline powered chain saws further indicates Black & Decker's inability to enter the market through internal expansion. *See FTC v. Procter & Gamble Co.,* 386 U.S.

---

\* *See also* D 245.

**62.** *See* note 58 *supra.*

568, 578, 580, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 166–67, 172 & n. 5, 175, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *In re Sterling Drug, Inc.*, 80 FTC 579, 594, 602 (1972). The government does not contend that Black & Decker had excess capacity which could have been utilized to manufacture gasoline powered chain saws. Rather Black & Decker's manufacturing experience is argued to be salient to the production of chain saws, thereby lessening the difficulties of de novo entry. In advocating this position, the government relies heavily upon the example of Skil Corporation which manufactures both gas and electric products. Through acquisition of a Canadian chain saw company, Skil obtained certain equipment used in the manufacture of gas chain saws, which was of the same type used in the production of electric tools. *See* Kaman Tr 748. Die casting machines, milling machines, lathes, grinders, honing equipment, heat treating equipment, painting equipment and polishing equipment are all used by Skil in manufacturing both gas and electric products. *See id.* at 733.

At the date of merger Black & Decker and McCulloch also used in their different manufacturing processes many common pieces of manufacturing equipment including boring, deburring and honing machines, lathes, milling machines and presses. *See* G 292; Plaintiff's Proposed Finding of Fact, ¶ 160. The mere fact of common manufacturing equipment does not, however, indicate that Black & Decker possessed gasoline tool manufacturing expertise. *See* G 379 (pp. 253–54).

Rather the evidence adduced at trial strongly suggests that Black & Decker's manufacturing expertise, like its technological capabilities, was restricted to the narrow area of electric tool production. Much of Black & Decker's manufacturing equipment has been extensively customized to achieve efficiencies in electric tool produc-

tion. That manufacturing equipment is basically of three types: general purpose machines that have been specially tooled, general machines that have been extensively tooled for a specific purpose, and highly specialized machines. *See* Barcus Tr 2956–58, 2969–71. The manufacturing equipment at the company's Hampstead, Maryland plant, its best equipped facility, is predominantly of the latter two types that are not suitable for gasoline chain saw manufacture.[63] *See* Decker Tr 2914–17, 2921–22; Barcus Tr 2954, 2959–3003; D 977 (1–77). In fact, Black & Decker has succeeded in reducing prices on its electric tools despite inflation through, in part, the increasing specialization of its manufacturing equipment. *See* Decker Tr 2919–21; Barcus Tr 2954.

The process of chromium plating, which enables the production of innovative, lightweight gasoline powered chain saws, illustrates the sophisticated expertise required for gas tool manufacture. After extensive precleaning, chromium plating is applied to the cylinders in a gas chain saw. To be effective this plating must meet strict functional requirements and must maintain close tolerances. The plating must be porous and of a certain pattern in order to hold oil properly. The intricacies of the plating process lie in achieving the proper thickness through uniform depositing of chromium so that the lubricant is held correctly. The plating must function in an environment where 10,000 times per minute fuel and air mixtures explode, creating heat from a blue flame. The plating, then, must be tough and durable and yet refined to precise tolerances. *See* Shaeffer Tr 3037–38; Graham Tr 3434–36; D 989 (pp. 98–100). The specialized art of chromium plating is alien to Black & Decker's electrical expertise. *See* Graham Tr 3434–36.

The specialized manufacturing experience at Black & Decker and its lack of such experience in certain areas of gas chain

---

**63.** Even for such routine manufacturing processes as milling, drilling, boring and facing Black & Decker has developed highly specialized equipment, called Kingsbury Machining Centers, that integrates various production steps while achieving the tolerances, internal dimensions, and geometric relationships critical to electric tool production. *See* Barcus Tr 2984; D 1016.

manufacture represent significant barriers to de novo entry.[64] The realization of integrated or even similar production facilities for gas and electric tools production does not appear to be within Black & Decker's capabilities.

Marketing is another requisite to successful de novo entry. *See* G 380 (p. 45); G 381 (pp. 42–43); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 578, 580, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *Ekco Products Co. v. FTC*, 347 F.2d 745, 753 (7th Cir. 1965); *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1249–50 (C.D.Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974). Black & Decker's dis-

tribution channels are separated into wholesale and retail distribution. The company's wholesale distributors include hardware, appliance, lawn and garden, electrical supply, automotive warehouse, industrial, construction and feeder type wholesalers.[65] *See* Leahy Tr 3644; G 180. Very few of Black & Decker's wholesalers carry gasoline powered chain saws. *See* Leahy Tr 3651; Lessans Tr 3793–97. Retail outlets for Black & Decker's products include hardware stores, appliance and paint stores, discount drug outlets, tool stores, automotive jobbers, catalog showrooms, mass merchandisers and building supply houses. *See* Leahy Tr 3652–52A; G 180. These volume oriented

**64.** In seeking to rebut this conclusion, the government relies on a pre-merger Black & Decker analysis of McCulloch. *See* G 285. In pertinent part that analysis states that

[t]he manufacturing operations at the McCulloch Corporation are very similar to those of Black & Decker. Die castings are used extensively in their products. . . . Hence the metal machining processes are the same; heat treating and plating, painting and final assembly are all strikingly similar to Black & Decker operations.

G 285 ("McC Mfg," p. 1). The government's reliance is, however, misplaced. Credible trial testimony indicated that the document was prepared and perceived as a selling document designed to overcome top management's aversion to acquisitions by minimizing the disparity between the two companies. *See* Graham Tr 3433–34; Lucier Tr 3515–19. Furthermore the analysis points out that McCulloch had developed specialized die casting processes and specialized chrome plating technology. *See* G 285 ("McC Mfg," pp. 1–2).

In claiming Black & Decker could manufacture chain saws, the government also introduced a gas chain saw plant evaluation prepared by the company's personnel, which indicates that such a plant could be constructed for three million dollars, a figure considerably less than the price paid for McCulloch. *See* G 281. Leaving aside possible problems of the factors motivating the report, the evaluation clearly presents only the briefest, preliminary analysis of the costs involved. *See* Nodar Tr 3712–15, 3722–25.

Moreover, the relatively low projected cost for the facility does not pertain to the question of whether Black & Decker had the technical expertise necessary to insure a properly functioning, manufacturing process. Unquestionably Black & Decker, with 1973 sales of over 425 million dollars and with net assets of 273 million dollars in 1972, amply possessed the eco-

nomic resources necessary to enter the gas chain saw market as is convincingly evidenced by the ease with which it acquired for between 42 and 65 million dollars an industry leader. *See* Lucier Tr 3533–34, 3546; note 6 *supra*; G 124, p. 10; G 125, p. 1; G 174 (Part II, p. 7); *United States v. Marine Bancorporation*, 418 U.S. 602, 642, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 172 n. 5, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1242, 1247, 1251 (C.D.Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974). The issue in this suit, however, is whether, given that financial capability, Black & Decker could feasibly develop, through internal expansion, the necessary technical and manufacturing expertise in a reasonably timely fashion. For the reasons discussed previously, the court believes the company could not.

**65.** The hardware wholesaler carries products sold to traditional hardware outlets. The appliance wholesaler sells such products as toasters, blenders, televisions, and washing machines to appliance retailers and to department stores. The lawn and garden wholesaler carrying such items as fertilizer, seeds, and hand tools sells to the garden supply retailer. The electrical supply distributor carries items such as sockets and wire for sale to electricians. The automotive parts distributor carries a broad range of products to support automotive repair facilities such as garages. The industrial distributor, selling to small and medium sized manufacturers carries such items as maintenance products. The construction distributor sells such items as commercial construction equipment to building contractors. The feeder wholesaler, working on small margins and depending on high volume, carries housewares and hardware for sale to mass merchandisers such as Korvettes. *See* Leahy Tr 3645–50.

retail distributors generally carry a broad range of relatively inexpensive, impulse type shelf items. The retailers do not normally have service capabilities on the premises. *See* Leahy Tr 3653. In large part these retailers do not sell gasoline chain saws. *See id.* at 3654; DiMenna Tr 3777–84; Lessans Tr 3797–3800, 3804. Over two-thirds of Black & Decker's portable electric tool sales are made in urban and adjacent suburban areas. *See* Leahy Tr 3656–60, 3698–3700; Lessans Tr 3798.

McCulloch wholesales its chain saws to specialty distributors of gasoline products. These distributors cover specific geographic areas and are responsible for the appointment and training of the retail dealers within their territory. Additionally, the distributors are responsible for establishing service centers in their areas and for providing service training to retail dealers. In order to meet its responsibility for gas chain saw servicing, the specialty distributor stocks a myriad of parts. "To insure adequate compensation for these major marketing and servicing responsibilities, the specialty distributors operate on large margins of between 16 and 20 percent. *See* Ronconi Tr 3809–10, 3813–15, 3819–21, 3827, 3829–30; G 45; G 48, p. 2; D 323, pp. 10–11. The distributors generally carry a number of gasoline powered outdoor products beyond chain saws, but they do not generally stock electric products.[66] *See* Ronconi Tr 3808, 3821–25.

Retail outlets for McCulloch gasoline powered chain saws include outdoor power equipment dealers, hardware stores, home improvement centers, farm equipment stores, lumberyards, mass merchandisers, lawn repair shops, and marine dealers. Ap-proximately three-quarters of these outlets provide servicing for the products sold. Most of these dealers are located in rural and outer suburban areas; similarly, most gas chain saw sales occur in these areas. *See* Ronconi Tr 3809–10, 3814, 3817–21; G 48, p. 2. *See also* G 378 (p. 72).

Despite the seeming incongruity between the marketing systems outlined above for gasoline and electric tool products, the government suggests that Black & Decker's marketing prowess significantly and perhaps uniquely qualifies the company as a de novo entrant. In buttressing this contention, the government points to Skil's marketing success.[67] Skil has a combined sales department for its gasoline and electric products and has largely utilized the same distribution channels to market its gasoline chain saw and electric products. *See* McCallister Tr 808, 813–821B. Yet fewer than half of Skil's wholesale distributors carry gas chain saws; only one-quarter to one-third of Skil's retailers carry gas chain saws. *See id.* 853–56. Moreover, R. G. McCallister, Skil's Executive Vice President, did not deny the substantial role played by the specialized outdoor gas product distributor, the type employed by McCulloch, in the marketing of gas chain saws. *See* McCallister Tr 856. In view of its eight years in the market, Skil's small market share [C.D.O.], also suggests the limited advantage of its combined marketing system. *See* G 329; D 538.

Marketing strength is critical to de novo success in the gasoline powered chain saw market. *See* G 379 (p. 271); G 381 (pp. 42–43). Indisputably Black & Decker has a powerful distribution and marketing system. *See* Straetz Tr 304; Nolan Tr 705.

---

**66.** Ronconi Equipment Company, one of McCulloch's distributors, attempted to distribute a line of Black & Decker outdoor garden equipment beginning in 1973. The venture was unsuccessful, however, since most of Ronconi's dealers did not retail electric products. Those that did bought largely from electrical wholesalers whose overhead is significantly less than that of the specialty gas product distributor. *See* Ronconi Tr 2825–28.

**67.** The government also asserts that an appreciable number of mass merchandisers such as Korvettes, major retail outlets for portable electric power tools, also sell gasoline powered chain saws, and thus represent a potential marketing advantage that could be exploited by Black & Decker. The mass merchandisers, however, account for a small portion of gasoline powered chain saw sales and do not present a major marketing opportunity for that product. *See* G 417–21. *See also* Ronconi Tr 3810–13.

Marketing channels for gasoline chain saws and portable electric tool products do overlap somewhat, particularly in law and garden type outlets. *See* G 380 (pp. 47, 96–97). Yet it is far from clear that the extent of that overlap, on either a wholesale or retail level, affords Black & Decker a meaningful competitive advantage. Rather the differing responsibilities of gasoline chain saw and electric tool product wholesalers, the geographic differences in retail outlets and customer sales, and the importance of securing retail outlets that provide service suggest Black & Decker's marketing expertise to be of limited value for de novo entry.

Successful de novo entry into the gas chain saw market requires the manufacturer, aside from its outlets, to possess proper servicing capability as an adjunct to the marketing process. *See* Straetz Tr 138, 162; Nolan Tr 546; McCallister Tr 824; Bartelt Tr 1010, 1013; D 990 (p. 18). In addition to independent authorized service centers, Black & Decker has over 100 factory owned service centers in the United States for its electric products. The company does not, however, service its gasoline powered generator products; rather for service the generators are sent to the company from which Black & Decker purchases the product's engine. *See* Decker Tr 2937–40; G 194; G 348.

Skil operates a dual system of product service centers, one type for all of Skil's products, gas and electric, the other for gas chain saws only. *See* McCallister Tr 822–24. The additional service stations are needed for chain saws because of that product's greater susceptibility to abuse. *See id.* at 824. From the weight of the evidence at trial it appears that servicing of gasoline powered chain saws is significantly less complex than servicing for electric tool products. *See* G 376 (pp. 27–29, 57–60, 141–42). No major obstacles would prevent Black & Decker from offering gas chain saw service at its extant service centers. Because of the importance of service in the gas chain saw area, this servicing capability, however, does not overcome a de novo entrant's need for servicing dealers of the

type not currently associated with Black & Decker.

Brand name recognition also relates to an entrant's de novo ability. See Straetz Tr 162, 306; Nolan Tr 568, 705; McCallister Tr 806–07; Bartelt Tr 1020–25; Deming Tr 1136–37; G 377 (p. 28); G 380 (p. 128). In this respect Black & Decker enjoyed a significant competitive advantage. Its brand name recognition and reputation are outstanding. *See* Nolan Tr 705; McCallister Tr 831; Lessans Tr 3805; G 377 (pp. 36–37, 171–72); G 379 (p. 55). Denying the transferability of brand name recognition, Black & Decker contends that its reputation for quality does not automatically extend to new products, especially to one outside its normal field, but rather must be earned product by product. *See United States v. Crowell, Collier & Macmillan, Inc.*, 361 F.Supp. 983, 999, 1001 (S.D.N.Y.1973). In attempting to secure competitive advantage, Black & Decker associated its name with the DeWalt stationary tool line and an air tool line both of which had been added by acquisition. *See* Decker Tr 2927–29. In neither instance did brand name recognition enhance product sales appreciably. *See id.* at 2927–2931. Similarly, it is suggested that the Black & Decker brand name will not prove a formidable competitive advantage for McCulloch. *See* Ronconi Tr 3831–32.

Defendants' argument overlooks the differing nature of the products involved. In the professional logger market where selection of a chain saw is likely to result from informed choice, the Black & Decker reputation, earned in the field of electric products, probably would not substantially assist McCulloch's sales. This limited transferability of brand name should accord with Black & Decker's earlier experience with stationary and air tools where again professional, informed choice is likely to prevail. Brand name could prove a decisive advantage, however, in the marketing of gas chain saws to the submarket of occasional users. Purchases by this segment, more likely to be impulsive and less informed, may well be influenced by the Black &

Decker reputation for quality. *See* McCallister Tr 806–07; G 294, p. 18; G 295, p. 28. Moreover, identification of the gas chain saws produced by McCulloch with Black & Decker does not preclude labelling the product with both companies' names. Black & Decker has employed this practice in marketing other products developed through merger. *See* Karkow Tr 3585–88, 3638. *See also* Decker Tr 2929–31. Brand name recognition, then, would facilitate Black & Decker's de novo entry into the occasional user gas chain saw market.

Advertising capability, in part productive of brand name recognition, also impacts on the likelihood of successful de novo entry. *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). *Cf. General Foods Corp. v. FTC*, 386 F.2d 936, 944–46 (3d Cir. 1967), *cert. denied*, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968). In marketing a consumer product such as a gas chain saw, especially with respect to the occasional user submarket, advertising can play a significant role. With its visual capability of demonstrating a chain saw in action, television has become increasingly important to gas chain saw marketing. *See* Straetz Tr 137, 145; McCallister Tr 825–29; G 21, pp. 11–14; G 47, p. 3; G 377 (p. 26). While defendants attempted to minimize the correlation between advertising expenditures and chain saw sales, the two interrelate. *See* pp. 752–753, *supra*.

In 1972, McCulloch expended [C.D.O.] dollars for advertising, [C.D.O.]. *See* G 309. In the same year Black & Decker spent 5.6 million dollars in national advertising and another 3.3 million dollars in cooperative advertising. *See* G 185. Gas chain saws could feasibly be integrated into Black & Decker's portable electric tool products advertising. *See* G 296–300; G 302–04; G 380 (pp. 47–48); G 381 (pp. 45–46); D 932. The possibility of such joint advertising does enhance Black & Decker's ability to enter the gas chain saw market de novo.

Consideration of all the factors indicative of Black & Decker's incentive and capability to enter the gas chain saw market through internal expansion, however, leads to the conclusion that such entry was infeasible. Certain product affinity does exist. To some extent portable electric tool products and gas chain saws are sold to the same suburban homeowner-type consumer. The two types of products can be jointly advertised, and both brand name recognition and servicing capabilities established in the portable electric tool field could contribute to successful de novo entry into the gas chain saw field. Clearly, Black & Decker possessed both the incentive and the economic strength to diversify into gas chain saws.

Gas and electric tool products are not, however, complementary. The technical sophistication necessary to design, develop and manufacture a gas powered chain saw was beyond Black & Decker's capability. The rapid pace of technological progress as well as the largely empirical nature of the art exacerbated Black & Decker's technical deficiencies in the two cycle gas engine area. The successful design of a gas chain saw results from a breadth of experience and a gradual process of trial and error product evolution. That design and development experience did not exist at Black & Decker and it could not have been obtained, even with the company's considerable resources, in any reasonable period of time. Moreover, Black & Decker lacked both the manufacturing and marketing expertise in gas chain saws to accomplish a successful de novo entry. Without these fundamental attributes of technological, manufacturing and marketing abilities, Black & Decker, whatever its possible brand name, advertising, and servicing advantages, could not feasibly have entered the market through internal expansion.

On the actual potential entrant claim, the issue remains whether Black & Decker could, however, have entered the gas chain saw market through toehold acquisition. *See Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 864–65 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). In its analysis of the gas chain saw market, Black & Decker in-

vestigated the possibility of entry through toehold acquisition, prior to winnowing its selection down to Beaird-Poulan and McCulloch.[68] In seeking an acquisition partner Black & Decker, consistent with its new core diversification policy, wanted to locate a company that had adequate technological capabilities to sustain growth potential. *See* Graham Tr 3425; Karkow Tr 3574–75. Given the complexity of the technology involved, successful toehold entry would require the acquired company to possess such technological expertise.

Initially the purchase availability of toeholds must be ascertained. In light of their relatively small market shares and their purchase availability, four companies are suggested by the government as toehold acquisition candidates: O & R, Campbell-Hausfeld, Quadra, and Desa.[69] O & R (Advanced Engines) ranking [C.D.O.] in unit sales with [C.D.O.] of market in 1972, was offered for sale to Black & Decker through a broker in 1973. *See* Nolan Tr 709–10; G 312A. O & R did not, however, present a

realistic toehold opportunity. Despite an association with Ford Motor Company which infused the company with both substantial amounts of money and manpower, O & R had serious product, manufacturing, and financial problems which undercut its ability to supply an adequate technological base. *See* Nolan Tr 592–602, 604–09, 619–23; Karkow Tr 3575–76; Weiss Tr 4979–83; D 1019–36.

Campbell-Hausfeld, ranking [C.D.O.] in unit sales with [C.D.O.] of the market in 1972, was for sale in 1971; it is unclear if the company's availability at that time was known to Black & Decker. *See* Deming Tr 1148; G 312A. When the new business group met later, it rejected Campbell-Hausfeld because of product and engineering deficiencies. *See* Karkow Tr 3577.[70] In 1973 the company manufactured only [C.D.O.] of the chain saws it sold, and hence it lacked a sufficient technological base. *See* Jt 7, pp. 2–3. While considering Black & Decker a potential purchaser in event of financial trouble, Quadra was not available

---

**68.** Neither Beaird-Poulan [C.D.O.], with [C.D.O.] of the unit sales of gas chain saws in 1972 [C.D.O.] in 1973, and [C.D.O.] in 1974 nor obviously McCulloch [C.D.O.], with [C.D.O.] for those years respectively would qualify as toehold acquisitions. *See* G 310A; G 311A; G 312A; note 4 *supra*; *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1258 (C.D. Cal.1973), *aff'd per curiam*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *Budd Co.*, 3 Trade Reg.Rep. ¶ 20,998, p. 20,857 (FTC 1975); *Beatrice Foods Co.*, 3 Trade Reg.Rep. ¶ 20,944, p. 20,792 n. 8 (FTC 1975); *The Bendix Corp.* [1970–1973 Transfer Binder] Trade Rep. ¶ 19,-288, p. 21,447–48 (FTC 1970), *vacated and remanded on other grounds*, 450 F.2d 534 (6th Cir. 1971).

By the time Black & Decker sought to pursue its interest in Beaird-Poulan, the company had been acquired by another large concern, the Emerson Electric Company. *See* Graham Tr 3425; Lucier Tr 3514; G 275; Jt 47, p. 10. McCulloch was left then as the only acquisition choice.

**69.** In its market examination Black & Decker considered, in addition to the four companies named by the government several others including Pioneer, Roper, Lancaster, and Clinton. None of these four represented a viable toehold candidate. As a division of the large Outboard Marine Company, Pioneer was not known to be available for sale and having no engineering capability independent of its parent, the divi-

sion could not supply the necessary technological base. *See* Karkow Tr 3576; *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 864 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). Similarly, Roper was owned partly by Sears & Roebuck and was not known to be for sale. *See* Karkow Tr 3579–80. With a sourced gasoline engine and concomitantly no gas expertise, Lancaster lacked an adequate technological base. *See id.* at 3578–79. Finally, Clinton Engine Company at the time of Black & Decker's study had so insignificant a market share that its ability to supply an adequate technological base was questionable. *See* note 45 *supra*. In 1973, Clinton sold a total of [C.D.O.] gas chain saw units. *See* Jt 8, p. 2. Further Clinton had a poor reputation for product quality in the gasoline powered chain saw field. *See* Karkow Tr 3579.

**70.** While there is no independent proof of these deficiencies in the record, Campbell-Hausfeld, even if it had adequate technological capabilities, did not, in light of its small and [C.D.O.] market share, offer any realistic possibility of producing market deconcentration or other significant procompetitive effects. *See* G 310A; G 311A; G 312A; *United States v. Marine Bancorporation*, 418 U.S. 602, 633, 638, 94 S.Ct. 2856, 2875, 2878, 41 L.Ed.2d 978 (1974).

for sale around the time of the Black & Decker/McCulloch merger and hence could not be considered a possible toehold candidate. *See* G 379 (pp. 48–49, 224–26).

Desa offered its Power Products Division including chain saw operations for sale to Black & Decker in late 1971.[71] *See* Deming Tr 1148. Desa had been formed in the late 1960's by former Black & Decker employees through the acquisition of two concerns, one being the Power Products Division of the Remington Arms Company. *See* Deming Tr 1135; D 538.[72] Under Desa's tutelage, that division manufactured light construction equipment such as vibrators, power trowels and power actuated equipment in addition to gasoline powered chain saws. *See* Deming Tr 1160.

Financial and product difficulties diminished Desa's attractiveness as an acquisition candidate. Burdened by heavy debt and a shortage of equity capital, Desa owed a bank loan that had come due and was confronted by the possibility of bankruptcy. *See id.* at 1168–71, 1188–90; D 1052, p. 13. While threatening Desa's viability, these financial difficulties might have been cured by a large capital infusion from Black & Decker. Desa's product problems were of a different order. [C.D.O.] *See* Sublett Tr 403, 408–10, 415–17, 420–26, 429, 470–79. *See also* Graham Tr 3494; Karkow Tr 3578. These product deficiencies strongly indicate that Desa lacked the ability to supply an adequate technological base for the design and manufacture of gas chain saws to a company unversed in such activities.[73]

If Desa failed to represent a feasible acquisition choice, its toehold status must also be questioned. In 1972, the year preceding the Black & Decker/McCulloch merger, Desa held in unit sales [C.D.O.] of the total gas chain saw market and [C.D.O.] of the occasional user submarket. *See* note 71 *supra.* Subsequently, both of these market shares have [C.D.O.]. *See id.*

No definitive toehold size limitation has been established. In *United States v. Phillips Petroleum Company,* 367 F.Supp. 1226, 1258 (C.D.Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974), the court held that a company ranking seventh with a 6–7% share in a concentrated market would not constitute a toehold. The court noted that the toehold concept entails acquisition of a small company that the acquiring firm must substantially need to build upon. *See id.* Both the overall gas chain saw market and the occasional user submarket exhibit considerably greater concentration than did the California gasoline market in *Phillips* and Desa's rank in either market [C.D.O.]. *See* pp. 748–749, notes 38, 71 *supra; United States v. Phillips Petroleum Co.,* 367 F.Supp. at 1253, 1258.

As noted previously, the FTC has apparently adopted the limitation that a firm having less than a 10 percent market share may presumptively qualify as a toehold. *See Budd Co.,* 3 Trade Reg.Rep. ¶ 20,998, p. 20,857 (FTC 1975); *Beatrice Foods Co.,* 3 Trade Reg.Rep. ¶ 20,944, p. 20,792 n. 8 (FTC 1975); *The Bendix Corp.,* [1970–1973 Transfer Binder] Trade Reg.Rep. ¶ 19,288, p. 21,-447–48 (FTC 1970), *vacated and remanded on other grounds,* 450 F.2d 534 (6th Cir. 1971). *See generally* R.D., 89 Harv.L.Rev. 800 (1976). Under such a rule, Desa, be-

**71.** The following table indicates Desa's market share and rank in unit sales for the years 1970 to 1974: [C.D.O.] *See* G 310A; G 311A; G 312A; G 313A; G 314A. In the occasional user submarket of those gasoline powered chain saws retailing for less than $200, Desa's market share and rank in unit sales for the same period were: [C.D.O.] *See* G 320; G 324; G 328; G 332; G 336.

**72.** Subsequent to the Black & Decker/McCulloch merger, Desa was itself acquired by Amca, a subsidiary of Dominion Bridge. *See* Deming Tr 1125.

**73.** Desa presented a further problem as an acquisition candidate. The company had offered to sell its Power Products Division to Black & Decker; that division, as previously mentioned, manufactured both light construction equipment and gasoline powered chain saws. *See* Deming Tr 1135, 1148, 1160. There was no evidence that Black & Decker could have purchased the chain saw operations separately, without the inclusion of an unwanted product line.

cause of its submarket role and [C.D.O.] market share, would not constitute a toehold acquisition candidate. *See also Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 865 n. 30 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974) (firm with 10% market share too large to be toehold); *Dept. of Justice Merger Guidelines, reported in*, 1 Trade Reg.Rep. ¶ 4510, p. 6888 (1975) (acquisition of one of four largest firms with approximately 10% market share or more in market where eight firm concentration ratio exceeds 75% suspect); Fox, *Toehold Acquisitions, Potential Toehold Acquisitions and Section 7 of the Clayton Act*, 42 Anti. L.J. 573, 581–82 (1973); Turner, *Conglomerate Mergers and Section 7 of the Clayton Act*, 78 Harv.L.Rev. 1313, 1367–70 (1965); Comment, *Toehold Acquisitions and the Potential Competition Doctrine*, 40 U.Chi.L. Rev. 156, 178–80 (1972).

Absent any clear judicial guidelines, the court believes that Desa, because of its market share in both relevant markets, the [C.D.O.] character of those shares, and its high rank in substantially concentrated markets is not a toehold firm. The company, then, does not represent a feasible means of small firm entry alternative to the McCulloch acquisition. Given this conclusion and in light of the impossibility of de novo entry into the gas chain saw market by Black & Decker and the lack of other toehold opportunities, the court holds that the first precondition to operation of the actual potential entrant doctrine, enunciated in *Marine Bancorporation*, has not been satisfied. 418 U.S. at 633–36, 94 S.Ct. 2856.

*Likelihood of Deconcentration or Other Significant Procompetitive Effects.*

Even if viable toehold candidates had existed, there appears little likelihood that they could have satisfied *Marine Bancorporation*'s second precondition by precipitating deconcentration or other significant procompetitive effects in the gas chain saw markets in this case.[74] 418 U.S. at 633, 636–39, 94 S.Ct. 2856. The continuing oligopolistic structure of the gasoline powered chain saw markets belies any realistic possibility for deconcentration or other procompetitive effects through toehold acquisition. For the overall gas chain saw market from 1970 to 1974 the top two manufacturers' market share declined from 54.6% to 48.4%, the top four manufacturers' market share rose from 71.9% to 75.1%, and the top eight manufacturers' share declined slightly from 92.9% to 92%. *See* G 315. *Compare* G 310A *with* G 314A. In the occasional user submarket from 1970 to 1974 the top two manufacturers' share declined from 53.9% to 50.3%, the top four manufacturers' share rose from 71.8% to 82% and the top eight manufacturers' share also grew from 93.9% to 96%. *See* G 320; G 324; G 328; G 332; G 336. Despite two firm concentration ratio declines, these figures solidly evidence highly concentrated markets without significant trend to deconcentration. While new entrants and small companies had improved their market shares, their combined market share, as evidenced by the concentration ratios, remained slight. *See* pp. 751–752 & nn. 44–45 *supra*; Jernigan Tr 5111; G 422.

In reaching the conclusion that the market toeholds lacked the capability to produce deconcentration or other significant procompetitive effects, the court does not overlook the growth opportunity that private label sellers, such as Sears & Roebuck, offer to new entrants and small companies. *See* Bartelt Tr 1015–19; Epstein Tr 2553–54; Jt 9, pp. 3–8; Jt 29, pp. 2–3; Jt 31, pp. 2–3. Yet, as mentioned previously, the total portion of market sales accounted for by the private labellers, which has shown no discernible increasing trend, is slight. *See* Jernigan Tr 1632; G 417–21. Hence, even through bulk sales to private label sellers the small gas chain saw manufacturers and new entrants could not and did not produce significant procompetitive effects much less deconcentration.

The Ford Motor Company experience with O & R further corroborates the inabili-

---

74. *See* note 28 *supra*.

ty of toehold acquisitions to satisfy *Marine Bancorporation*'s second precondition. O & R, a small manufacturer of gas chain saw engines, began their association with Ford through a development contract.[75] Thereafter Ford acquired an equity interest in O & R which came to amount to between 37 and 38 percent with an option to acquire 51 percent. Additionally, Ford invested through loans at least two and a half million dollars in the O & R enterprise, supplied considerable manpower, and allowed O & R use of certain patents. *See* Nolan Tr 590–602; Weiss Tr 4979–83. *See also* D 1019–36. Despite these advantages O & R was plagued by product deficiencies, discussed *supra*, and the company never acted as a significant procompetitive force in the market.

As a de novo entrant, Black & Decker offered even less prospect for achieving significant procompetitive effects. Lacking two cycle gas engine expertise, the company, whatever its servicing or brand name capabilities, could not have hoped to exceed the market performance of new entrants possessed of such experience. Those new entrants, as previously mentioned, have failed to secure sizeable market shares or to precipitate other competitive effects. *See* pp. 751–752 & nn. 44–45 *supra*.

Analysis of the gas chain saw markets involved in this case indicates that feasible means of entry alternative to the challenged Black & Decker/McCulloch merger were not available. Further even had such avenues of entry existed, they held no promise of deconcentrating the market or producing other significant procompetitive effects. The government, then, has failed to satisfy its burden of proof with respect to the actual potential entrant claim. *See United States v. Marine Bancorporation,*

418 U.S. 602, 638–39, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

### Perceived Potential Entrant Claim

■ Determination that Black & Decker was not an actual potential entrant into the gasoline powered chain saw market does not foreclose the possibility that the company was, in fact, a perceived potential entrant. As the Court stated in *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532–33, 93 S.Ct. 1096, 1100, 35 L.Ed.2d 475 (1973):

> [T]he District Court erred as a matter of law. The error lay in the assumption that because Falstaff, as a matter of fact, would never have entered the market *de novo*, it could in no sense be considered a potential competitor. More specifically, the District Court failed to give separate consideration to whether Falstaff was a potential competitor in the sense that it was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market.

> \*　　\*　　\*　　\*　　\*　　\*

> Thus, the fact that Falstaff and its management had no intent to enter *de novo*, and would not have done so, does not *ipso facto* dispose of the potential-competition issue.

*See also FTC v. Procter & Gamble Co.*, 386 U.S. 568, 575, 580–81, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 173–74, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1234 (C.D.Cal.1973), aff'd per curiam, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *United States v. Wilson Sporting Goods Co.*, 288 F.Supp. 543, 562–63 (N.D.Ill.1968).[76]

---

**75.** For the period 1970–1974 O & R's (Advanced's) market share and rank in unit sales in the overall gas chain saw market were as follows:

[C.D.O.] *See* G 310A; G 311A; G 312A; G 313A; G 314A.

For the period 1970–1974 O & R's (Advanced's) market share and unit sales in the occasional user submarket were:

[C.D.O.] *See* G 320; G 324; G 328; G 332; G 336.

**76.** In *United States v. Marine Bancorporation,* 418 U.S. 602, 639, 94 S.Ct. 2856, 2878, 41 L.Ed.2d 978 (1974), the Court did, however, state: "[T]he Government's failure to establish that NBC [the acquiring firm] has alternative methods of entry that offer a reasonable likelihood of producing procompetitive effects is de-

■ In analyzing a firm's possible status as a perceived potential entrant, many of the economic facts appraised in considering the actual potential entrant claim, such as a firm's incentive and capability to enter, pertain. *See United States v. Falstaff Brewing Corp.*, supra, 410 U.S. at 534–36 & n. 13, 93 S.Ct. 1096, *on remand*, 383 F.Supp. 1020 (D.R.I.1974); *United States v. Phillips Petroleum Co.*, supra; *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 76–77 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974). Additionally, the perceptions of the prospective entrant by firms in the market must be explored. *See United States v. Falstaff Brewing Corp.*, supra; *United States v. Phillips Petroleum Co.*, supra.

Industry recognition of Black & Decker as a likely potential entrant into the gasoline powered chain saw market varied. William H. Nolan, former head of O & R, perceived Black & Decker, despite the non-gas nature of its product line, as the most significant potential entrant into the gas chain saw field because of the company's broad distribution system, brand name reputation, and resultant marketing capabilities. *See* Nolan Tr 560–61, 567, 663–64, 690. R. G. McCallister, Executive Vice-President of Skil, which manufactures both portable electric tool products and gasoline powered chain saws, also believed Black & Decker to be the most likely potential entrant into the

market. *See* McCallister Tr 834, 927, 962, 978. McCallister considered gas chain saw sales to be shifting to an increasingly consumer-oriented, mass merchandise retail type of market. Because of Black & Decker's distribution strength in those markets, McCallister believed gas chain saws represented a logical extension for Black & Decker's product line. *See id.* at 834–35. In reaching this conclusion, McCallister was influenced by Skil's own product extension growth from electric products into gas chain saws. *See id.* at 835.

Because of Black & Decker's brand name advantages, and servicing, manufacturing and financial capabilities, the company was perceived by Robert H. Deming, former President of DESA, as a very likely potential entrant. *See* Deming Tr 1146–47. James M. Conly, President of Beaird-Poulan, believed that Black & Decker was one of the two most likely entrants (the other being Ford Motor Company), because of Black & Decker's "tremendous marketing ability" in both brand name awareness and breadth of distribution outlets and due to its prior history of strong internal expansion.[77] Moreover, the successful entry of Skil into the gas chain saw market suggested to Conly that Black & Decker was a likely entrant. *See* G 377 (pp. 35–39). Henry J. Hutchison, President of Quadra Manufacturing, considered Black & Decker as one of several likely potential entrants,

terminative of the fourth step of its argument [the perceived potential entrant claim]." Evidently, the Court found that the extensive regulatory barriers that precluded de novo or toehold entry were so pronounced that rational competitors in the market could not reasonably have believed firms outside the market capable of entry. Hence, the possibility of procompetitive edge effect was found improbable. *See id.* at 639–40, 94 S.Ct. 2856. Absent the magnitude of regulatory restraints present in *Marine Bancorporation* that would be widely appreciated in the industry, a firm could still exert a procompetitive edge effect while not actually being an actual potential entrant.

The Court's treatment in *Marine Bancorporation* of the perceived potential entrant aspect of potential competition may have further significance. The Court appears to have engrafted the two preconditions to actual potential competition onto the perceived potential competition doctrine. In other words the Court now

apparently requires that the firms in the relevant market not only perceive that the entering firm will enter the market but also that the avenue of entry be perceived as possessing the capability of precipitating significant procompetitive effects. *See id.* Compare *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 533–34 & n. 13, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (sufficient if perceived potential entrant intends to enter and is capable of such entry). *See generally* Note, *United States v. Falstaff Brewing Corporation: Potential Competition Re-examined*, 72 Mich.L.Rev. 837 (1974).

77. After its unsuccessful experience with O & R (Orline), Ford was not considered by Beaird-Poulan to be a likely potential entrant. Ford was only earlier considered a potential entrant because of its equity position in O & R which was taken to evidence an interest in the manufacture of gas chain saws. *See* G 377 (p. 35).

based on its product fit with gas chain saws and its complementary marketing system. *See* G 379 (pp. 43, 45–49, 224–26).[78]

A lesser number of market participants did not perceive Black & Decker as a likely potential entrant. Robert P. Straetz, formerly head of Homelite which led the industry in units manufactured for the years 1970 to 1974, did not consider Black & Decker as a probable entrant because of its commitment to electric and air, as opposed to gas, product lines. *See* Straetz Tr 265. Dr. Benjamin Sheaffer, a former employee of both Homelite and McCulloch, testified that he had never considered Black & Decker as a potential entrant and that he had never heard anyone in the marketing or engineering departments at Homelite or McCulloch refer to Black & Decker as a potential entrant. *See* Sheaffer Tr 3077. Because of its predominantly electric expertise, Black & Decker was not perceived as a potential entrant by David L. Weiss, formerly Vice-President of O & R. *See* Weiss Tr 4984.

■ A segment of the gas chain saw industry did perceive Black & Decker as a likely potential entrant. Yet Homelite, which accounted for a major portion of the market, and others had no such perceptions. Weighing the evidence, the court believes that the government has failed to satisfy its burden of showing that Black & Decker was perceived by the gas chain saw industry as a likely potential entrant.

Even if the proof at trial had established that Black & Decker was perceived as a likely potential entrant, which it did not, the issue remains whether "the number of potential entrants was not so large that the elimination of one would be insignificant." *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 581, 87 S.Ct. 1224, 1231, 18 L.Ed.2d 303 (1967). *Accord United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 534 n. 13, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). *See* note 23 *supra.*

David L. Weiss, of O·& R, believed Outboard Marine with its gas engine expertise constituted the "prime" potential entrant. *See* Weiss Tr 4985. In compiling a list of possible purchasers, Power Machinery selected several companies: Gibson, Skil, Arctic Industries, Ariens and Coleman in addition to Black & Decker as major merger prospects. *See* G 379 (pp. 43, 216–24). Companies were selected on the basis of their financial ability, product reputation and product and marketing affinity. *See id.* at 44. As potential purchasers in the event of financial difficulties, Quadra Manufacturing chose, among others and in addition to Black & Decker, Doehler Jarvis, Stihl and Outboard Marine. *See id.* at 236. James Hutchison of Quadra also identified lawn and garden equipment manufacturers and motorcycle manufacturers such as Honda, Kawasaki and Yamaha as potential entrants into the gas chain saw markets. *See id.* at 139–45. James Conly of Beaird-Poulan, in addition to naming Black & Decker and Ford Motor Company as potential entrants, also identified International Harvester as a likely entrant. *See* G 377 (p. 158).

Robert P. Straetz of Homelite considered the Japanese motorcycle manufacturers, such as Kawasaki, Honda and Suzuki, as more likely entrants from a technological viewpoint than Black & Decker. *See* Straetz Tr 247–48, 267. Believing two cycle gas expertise to be critical, Dr. Benjamin Sheaffer, who worked for both Homelite and McCulloch, perceived Honda and Yamaha in addition to companies such as Yanmar, Mercury Marine and Jacobsen as likely entrants. *See* Sheaffer Tr 3077–85.

Given the growth of the market, these wholly rational perceptions of a large number of likely potential entrants are sup-

---

**78.** At trial additional evidence was introduced of perceptions of Black & Decker as being or not being a likely potential entrant into the market of the manufacture and sale of gas chain saws by persons not presently engaged in that market. *See* Jernigan Tr 1603–04; Decker Tr 2934–35; G 380 (pp. 157–58, 169); G 381 (pp. 214–15); D 538; D 989 (pp. 106–07). *See also* Ronconi Tr 3831–33; D 990 (pp. 24–25). Not reflecting the perceptions of market participants, control of whose behavior is the aim of perceived potential competition, this evidence is not probative.

ported by the evidence. *See* p. 750 & n. 42 *supra.* The number of significant potential entrants into the gas chain saw market exceeds the number of such entrants in earlier cases where the loss of a perceived potential entrant was found to violate section 7. *See United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). *Compare United States v. Hughes Tool Co.,* 415 F.Supp. 637 at 645–646 (C.D.Cal.1976).

Consideration of objective economic factors about Black & Decker confirms that the company was not the most likely potential entrant into the gasoline powered chain saw market out of a small group. *See United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 534–35 n. 13, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), *on remand,* 383 F.Supp. 1020 (D.R.I.1974); *United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1256 (C.D. Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974). The Black & Decker/McCulloch merger does not resemble geographic extension mergers where the acquiring company is already in the relevant line of commerce, has the requisite expertise and often has clear incentive for entry. *See United States v. Falstaff Brewing Corp., supra; United States v. Phillips Petroleum Co., supra* at 1254–56; *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 862–63 & n. 20 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

Nor are the portable electric tool products manufactured by Black & Decker and gas chain saws closely related or complementary so that the challenged merger becomes a logical vehicle for product extension. *See FTC v. Procter & Gamble Co.,* 386 U.S. 568, 572–81, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 172 n. 5, 174–75, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 660, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); *Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 77 (10th Cir. 1972), *cert. denied,*

416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *General Foods Corp. v. FTC,* 386 F.2d 936, 944 (3d Cir. 1967), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 561 (N.D.Ill. 1968). As analyzed in deciding the actual potential entrant claim Black & Decker, unlike companies found in prior cases to be perceived potential entrants, lacked the technical design, development and manufacturing abilities necessary to produce a gas chain saw. *See FTC v. Procter & Gamble Co., supra* 386 U.S. at 580, 87 S.Ct. 1224; *United States v. Penn-Olin Chemical Co., supra* 378 U.S. at 175, 84 S.Ct. 1710; *Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc.,* 414 F.2d 506, 514 (3d Cir. 1969), *cert. denied,* 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 50 (1970); *United States v. Wilson Sporting Goods Co., supra* at 561–62. While Black & Decker possessed the financial capabilities for market entry so did a large number of other identified potential entrants. *See United States v. Marine Bancorporation,* 418 U.S. 602, 642, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Falstaff Brewing Corp., supra* 410 U.S. at 533, 93 S.Ct. 1096; *United States v. Penn-Olin Chemical Co., supra;* D 157, D 643, D 992, p. 16 (Honda); D 163, pp. 1–2, D 164, pp. 1–2, D 992, pp. 16–17 (Kawasaki); D 137, p. 2, D 992, pp. 17–18 (Suzuki); D 185, D 186, p. 2, D 992, pp. 19–20 (Yamaha); D 12, D 637 (Jacobsen); D 633 (International Harvester).

Prior to its acquisition Black & Decker had not evidenced strong desire for entry into the gas chain saw market. No activities such as unsuccessful prior entry attempts would have put the market on notice of Black & Decker as a likely potential entrant. *See United States v. Falstaff Brewing Corp., supra* at 534–35 n. 13, 93 S.Ct. 1096; *United States v. Penn-Olin Chemical Co., supra* 378 U.S. at 166–67, 84 S.Ct. 1710; *United States v. El Paso Natural Gas Co., supra* 376 U.S. at 653–56, 658–62, 84 S.Ct. 1044; *United States v. Phillips Petroleum Co., supra* at 1256. Moreover, the condition of entry into the gas chain saw market, while reflecting high techno-

logical barriers and while being in part responsible for high concentration, nonetheless, was not so severe that new entrants had not successfully entered. *See* pp. 750–751 *supra.* *Compare United States v. Penn-Olin Chemical Co., supra* 378 U.S. at 164, 84 S.Ct. 1710.

No recent de novo entrant had achieved market entry without gas expertise, which factor also undercuts Black & Decker's status as one of the likeliest perceived potential entrants. *See* D 538. Recent entrants into the United States gas chain saw market have most often been foreign gas chain saw manufacturers with two cycle gas engine experience such as Stihl, Quadra, Dolmar, Jobu, Partner, Kioritz, and Oleo-Mac. *See id.;* Jt 12, 17, 18, 19, 27, 29, 32, 38, 40, 43. In this regard, Ford Motor Company's unsuccessful toehold experience with O & R further diminishes any rational perception of Black & Decker as a likely potential entrant. Despite its nearly unparalleled four-cycle gasoline engine expertise and its vast financial resources, Ford did not succeed in achieving viable market entry through exploitation of O & R's two cycle gas engine experience. *See* pp. 766–767, *supra.* The failure of a company such as Ford with greater technical proximity to the gas chain saw market than Black & Decker to enter successfully enhances the perceived potential entrant status of those foreign chain saw manufacturers, such as Yanmar, not yet in the United States market. Moreover Ford's failure reduces the possibility that gas chain saw manufacturers would believe that Black & Decker through whatever means of entry had the capability of deconcentrating the market or producing other significant procompetitive effects.

*See United States v. Marine Bancorporation, supra* 418 U.S. at 639–40, 94 S.Ct. 2856.

 In sustaining its burden of proving that Black & Decker exerted a pro-competitive edge effect prior to its merger with McCulloch, the government need not introduce evidence of actual market response to Black & Decker's influence. *See United States v. Falstaff Brewing Corp., supra* 410 U.S. at 534–35 n. 13, 93 S.Ct. 1096; *Brown Shoe Co. v. United States,* 370 U.S. 294, 346, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. Phillips Petroleum Co., supra* at 1257. *Cf. FTC v. Procter & Gamble Co., supra* 386 U.S. at 577, 87 S.Ct. 1224; *United States v. Penn-Olin Chemical Co., supra* 378 U.S. at 171, 84 S.Ct. 1710. Nonetheless, the absence of any actual market response to Black & Decker as a perceived potential entrant tends to corroborate the objective factors indicating Black & Decker not to be one of the most likely perceived potential entrants into the gas chain saw market.[79] *See, e. g.,* G 377 (p. 125); G 378 (Part II, pp. 74–76); G 379 (pp. 137–39).

 The evidence presented in this case therefore indicates that Black & Decker was not so positioned on the edge of the market as to exert a pro-competitive effect on market participants. Since the elimination of Black & Decker through its merger with McCulloch did not remove one of the most likely of a small group of potential entrants, that merger is not proscribed on a perceived potential entrant theory under section 7.

*Entrenchment*

 The government contends that the combination of Black & Decker with

---

**79.** The government offered proof of two instances of actions taken by gas chain saw manufacturers in response to perceptions of Black & Decker as a potential entrant. In 1972 Skil devised a marketing plan of dealer incentives and some lower retail prices that was allegedly motivated in part by concern about a possible Black & Decker entry into the gas chain saw market. *See* McCallister Tr 835–37; G 301. As noted during the trial, the evidence supporting this perceived potential entrant effect was, however, not credible. Tr 2357.

Evidence was also introduced that in 1971 Desa, after learning that Lombard, a gas chain saw manufacturer, was for sale and apprehensive of a Black & Decker/Lombard combination, offered itself for sale to Black & Decker. *See* Deming Tr 1148. The purported motivation for Desa's offering to Black & Decker is not convincing; more likely, Desa's serious and continuing financial problems prompted the overture. *See id.* at 1168–71, 1188–90; D 1052, p. 13.

McCulloch will entrench and dominate the concentrated gas chain saw market. In *FTC v. Procter & Gamble Co., supra,* the Court determined that the acquisition of Clorox, the nation's leading bleach manufacturer in a heavily concentrated market, by Procter & Gamble, a leading detergent manufacturer, resulted in entrenchment and violated section 7. In reaching this conclusion, the Court emphasized the vital role of advertising in marketing liquid bleach and the volume discounts and complementary advertising opportunities available to Procter & Gamble in promoting Clorox. *See id.* at 572–73, 87 S.Ct. 1224. *See also General Foods Corp. v. FTC,* 386 F.2d 936, 945–46 (3d Cir. 1967), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968). The Court further noted that because of these advantages the Procter & Gamble/Clorox merger resulted in the dominant firm's complete overshadowing of the other companies in the market. Therefore, due to the abundant resources available to Clorox, the Court found the merger would effectively raise barriers to entry in the liquid bleach market.[80] *See* 386 U.S. at 578–80, 87 S.Ct. 1224.

Other factors, besides those enumerated in *Procter & Gamble,* relevant to analysis of possible entrenchment include the degree of synergy between the acquired and acquiring firms' marketing and manufacturing systems, between their technologies, and between their brand name recognition. *See United States v. Hughes Tool Co.,* 415 F.Supp. 637 at 644–645 (C.D.Cal. May 27, 1976); *United States v. Crowell, Collier & Macmillan, Inc.,* 361 F.Supp. 983, 992–93 (S.D.N.Y.1973); *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 554–56 (N.D.Ill.1968); *In Re Sterling Drug, Inc.,* 80 FTC 579, 604–05 (1972). In examining an entrenchment claim, the basic inquiries involve the nature of the relevant market, the possible advantages the acquiring firm can bestow on its merger partner, and the likelihood that those advantages will produce a

firm so dominating the market that entry barriers are raised. *See generally Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 866 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 78–79 (10th Cir. 1972), *cert. denied,* 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974).

■ Earlier portions of this opinion largely dispose of the entrenchment claim. Black & Decker's engineering, marketing and manufacturing expertise were not complementary to McCulloch's. Gas and electric technological expertise differ significantly. Marketing of gas chain saws involves specialty wholesalers and servicing dealers located in rural and outer suburban areas. Marketing of portable electric tool products through electric product wholesalers and non-servicing retail dealers predominantly urban and adjacently suburban in character, does not appreciably overlap the gas product distribution system. Moreover, while displaying certain limited similarities, the manufacturing processes for gas chain saws and portable electric tool products are not susceptible to integrated production. In the three critical areas of technical expertise and marketing and manufacturing experience, then, Black & Decker possessed no advantages which could be extended to McCulloch for competitive gain. These product differences also demonstrate that the gas chain saw and portable electric power tools are not predominantly complementary. The potential for entrenchment is thereby significantly lessened. *See General Foods Corp. v. FTC,* 386 F.2d 936, 944–46 (3d Cir. 1967), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); *United States v. Crowell, Collier & Macmillan, Inc.,* 361 F.Supp. 983, 992–93 (S.D.N.Y. 1973); *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 554–56, 564–65 (N.D.Ill.1968); *Beatrice Foods Co.,* 3 Trade Reg.Rep. ¶ 20,944, pp. 20,792–93 (FTC 1975).

---

**80.** The Court also determined Procter & Gamble to be the most likely potential entrant into the liquid bleach market based on a variety of factors including its leadership in a related industry, its diversification policy, and its complementary marketing and manufacturing expertise. *See* 386 U.S. at 580–81, 87 S.Ct. 1224.

In certain areas, however, Black & Decker arguably has the capability of enhancing McCulloch's sales. Black & Decker could jointly advertise its portable electric tool products with McCulloch's products and the portable electric tool manufacturer could exploit its brand name recognition in the occasional user gas chain saw market.[81] *See* Nolan Tr 572; G 377 (pp. 41, 162); G 381 (pp. 47, 165). Both national advertising, especially television advertising, and brand awareness have become increasingly important in the sale of gas chain saws. *See* Bartelt Tr 1021–26. *Cf.* G 380 (p. 32). While these advantages are significant, they do not pose the threat of entrenchment found in *Procter & Gamble*.[82] Unlike liquid bleaches which were chemically indistinguishable and therefore relied exclusively on advertising for product differentiation, gas powered chain saws offer a variety of different features tailored to heterogeneous types of purchasers and requirements. *See FTC v. Procter & Gamble Co., supra,* 386 U.S. at 572, 87 S.Ct. 1224; Jernigan Tr 5059–63; D 562. Further the gas chain saw product, with an average unit price exceeding $100, presumably represents a considerably more deliberate kind of purchase than the routine procurement of laundry detergent or bleach, where advertising may be more persuasive. *See FTC v. Procter & Gamble Co., supra,* 386 U.S. at 571–72, 87 S.Ct. 1224; *United States v. Lever Bros. Co.,* 216 F.Supp. 887, 893 (S.D.N.Y.1963); D 534. With a relatively complex product such as a two cycle gas chain saw, product design and engineering can play a critical role in consumer acceptance; Black & Decker could assist McCulloch in neither of these areas.[83]

The nature of the companies in the gas chain saw market further lessens the potential for entrenchment. Many of the companies involved in that market equal or surpass Black & Decker in financial strength and are thus unlikely to fear domination by a Black & Decker/McCulloch combination.[84] *See Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 865–66 & n. 32 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *United States v. Wilson Sporting Goods Co., supra* at 557–58; *Beatrice Foods Co.,* 3 Trade Reg.Rep. ¶ 20,-944, p. 20,793 (FTC 1975); *In Re Sterling Drug, Inc.,* 80 FTC 579, 605–06 (1972); Turner, *Conglomerate Mergers and Section 7 of the Clayton Act,* 78 Harv.L.Rev. 1313, 1356–57 (1965). In 1973, Black & Decker

---

**81.** As evidence of Black & Decker's brand name power and its potential for entrenching McCulloch, the government suggests that O & R (Advanced), one of the small gas chain saw manufacturers, left the market because of its apprehension of a Black & Decker/McCulloch combination. *See* Nolan Tr 668–70, 671–77. Yet credible evidence was introduced that Advanced remains in the gas chain saw business and has established a new product name. *See id.* at 676; D 1032. Moreover, Ormonde which acquired O & R did so with full knowledge of the Black & Decker/McCulloch combination. *See* Nolan Tr 667. The prospect for entrenchment, then, was insufficient to forestall new investment in the gas chain saw market.

The government also suggests that Desa was so intimidated by the prospect of Black & Decker entering the market that the company offered itself for sale to the electric tool manufacturer. *See* Deming Tr 1148. As indicated previously, this explanation is not convincing since Desa's persistent financial problems more sensibly explain the offer. *See* note 79 *supra.*

**82.** The president of one small gas chain saw manufacturer, Quadra, believed Black & Decker's advertising capabilities could, in fact, achieve a pro-competitive effect by stimulating consumer demand for the product generally. *See* G 379 (pp. 266–67).

**83.** [C.D.O.]

**84.** Black & Decker through its merger with McCulloch is also alleged to have created psychological barriers to entry. The government points to the testimony of a McGraw Edison official to the effect that the availability of Black & Decker's extensive distribution system to McCulloch has foreclosed McGraw Edison's future consideration of entry into the gas chain saw market. *See* G 381 (pp. 47–48). To be discussed more fully *infra* in consideration of the alternative purchaser requirement of the failing company defense, the seriousness of McGraw Edison's interest in the gas chain saw market is questionable. Certainly the company was not commonly perceived as desiring market entry. *See* 430 F.Supp. at 756, *supra.* Further there has been no showing why Black & Decker, one large company among many in the gas chain saw market, should have precipitated any unique fear of market power.

had sales of 427 million dollars.[85] Textron the parent company of Homelite, in 1973 had sales of 1.8 billion dollars. *See* Jt 16, pp. 6, 113. Emerson Electric Company, of which Beaird-Poulan was a subsidiary, had sales of 952 million dollars in 1973. *See* Jt 47, p. 10; G 377 (CDX 13, p. 5). Outboard Marine Corporation, of which Pioneer was a division, had 471 million dollars in sales in 1973. *See* Jt 26, pp. 69, 86. Kioritz Corporation of America is controlled by Kioritz Corporation of Japan and by Mitsui Corporation of Japan. *See* Bartelt Tr 1032. Mitsui had sales of approximately 17 billion dollars in 1973. *See* D 544; D 560. Roper Corporation is partly owned by Sears & Roebuck which had 12.3 billion dollars in sales in 1973. *See* Karkow Tr 3579–80; G 378 (p. 15); Jt 33, p. 54. Similarly, Skil was partly controlled by Gulf & Western, a conglomerate with 2.3 billion dollars in sales in 1973. *See* Epstein Tr 2576–77.

Aside from these economic giants with interests in the gas chain saw market, a number of substantial companies, albeit smaller than Black & Decker, are also active in the market. For example, Jobu is a subsidiary of Elkem-Spigerverkett, a large Norwegian enterprise, with 1973 sales of approximately 275 million dollars. *See* D 546–47. Campbell-Hausfeld is a division of Scott & Fetzer Corporation, which had 1973

sales in excess of 270 million dollars.[86] *See* Jt 7, pp. 1, 80.

The Black & Decker/McCulloch merger does not present the likelihood of entrenching either the overall gas chain saw market or the occasional user submarket. Those markets are populated by large companies unlikely to be daunted by a Black & Decker/McCulloch combination. Of equal significance, the electric and gas products made by the two companies do not offer the potential for significant integration in either marketing or manufacturing. Absent such product affinity Black & Decker does not appear capable of conferring decisive competitive advantages that could result in McCulloch dominating gas chain saw markets.

### The Failing Company Defense

While the court's finding that the Black & Decker/McCulloch merger does not violate section 7 precludes defendants' need to rely on the failing company defense, nonetheless, in the interest of providing a suitable record for possible appellate review, that issue will be decided.[87] The failing company defense was first judicially engrafted onto section 7 by the Supreme Court in *International Shoe Co. v. FTC,* 280 U.S. 291, 299–303, 50 S.Ct. 89, 74 L.Ed. 431 (1930).[88] International Shoe Company, a

---

**85.** This figure does not include McCulloch sales, which for the first nine months of 1973 prior to the merger totalled 55.7 million dollars. *See* G 125, p. 1; D 322, p. 4.

**86.** Additionally, Dolmar has merged with Fichtel-Sachs, a substantial German concern with sales in excess of 200 million dollars in 1973, and Desa has recently merged with Amca, itself a subsidiary of the large Dominion Bridge Company. *See* Deming Tr 1125; D 139; D 547; D 560; D 1052.

**87.** In their answer to the complaint, defendants initially raised the affirmative defense that Black & Decker had acquired McCulloch for the purposes of investment only. *See United States v. Black & Decker Mfg. Co.,* No. B–73–964, Clerk's File # 13, p. 4; 15 U.S.C. § 18 (1973). Subsequently, defendants have not pressed this theory and it is unclear if the defense is still being raised. In any event, the evidence at trial discloses without question that Black & Decker did not acquire McCulloch solely for the purpose of investment. Rather

the portable electric tool manufacturer has taken an active role in controlling McCulloch by, *inter alia,* installing a former Black & Decker executive as its president. *See* G 6; G 8; G 289; *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *Hamilton Watch Co. v. Benrus Watch Co.,* 114 F.Supp. 307, 313–14, 316–17 (D.Conn.1953), *aff'd,* 206 F.2d 738 (2d Cir. 1953); *Swift & Co. v. FTC,* 8 F.2d 595, 599 (7th Cir. 1925), *rev'd on other grounds,* 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405 (1926); *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 563 (E.D.Pa.1960), *aff'd per curiam,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 556 (N.D.Ill.1968).

**88.** In amending the Clayton Act in 1950, Congress expressly approved the retention of the failing company defense. *See United States v. General Dynamics Corp.,* 415 U.S. 486, 506–07, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Brown Shoe Co. v. United States,* 370 U.S. 294, 319 &

manufacturer and distributor of shoes, acquired in 1921 McElwain Company in a horizontal merger. Prior to merger McElwain within one year had reversed a four million dollar surplus position into a four million dollar deficit. The company owed 15 million dollars in bank debt, was unable to pay its debts when they came due, and by state law, was on the brink of involuntary liquidation. Moreover, McElwain's plants were operating at a fraction of capacity. *See id.* at 299–301, 50 S.Ct. 89.

The *International Shoe* Court defined a failing company as

> a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with resulting loss to its stockholders and injury to the communities where its plants were operated
> . . . . .

*Id.* at 302, 50 S.Ct. at 93. *See also Brown Shoe Co. v. United States,* 370 U.S. 294, 319, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In finding the acquired firm to be a failing company the Court noted

> the evidence establishes the case of a corporation in failing circumstances, the recovery of which to a normal condition was, to say the least, in gravest doubt, selling its capital to the only available purchaser . . . .

280 U.S. at 301, 50 S.Ct. at 92. *See id.* at 302, 50 S.Ct. 89.

In *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), the Court, "confin[ing] the failing company doctrine to its present narrow scope", strongly reiterated the alternative purchaser requirement, stating

> [T]he failing company doctrine plainly cannot be applied in a merger . . .

unless it is established that the company that acquires the failing company or brings it under dominion is the only available purchaser. For if another person or group could be interested, a unit in the competitive system would be preserved and not lost to monopoly power.

*Id.* at 138, 139, 89 S.Ct. at 931. *Accord United States v. General Dynamics Corp.,* 415 U.S. 486, 507, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *United States v. Greater Buffalo Press, Inc.,* 402 U.S. 549, 555, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971); *Golden Grain Macaroni Co. v. FTC,* 472 F.2d 882, 887 (9th Cir. 1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973); *United States Steel Corp. v. FTC,* 426 F.2d 592, 608 (6th Cir. 1970); *Calnetics Corp. v. Volkswagen of America,* 348 F.Supp. 606, 622–23 (C.D.Cal.1972); *United States v. G. Heileman Brewing Co.,* 345 F.Supp. 117, 123 (E.D.Mich.1972). "The burden of proving that the conditions of the failing company doctrine have been satisfied is on those who seek refuge under it." [89] *Citizen Publishing Co. v. United States,* 394 U.S. at 138–39, 89 S.Ct. at 931 [footnote omitted]. *Accord United States v. General Dynamics Corp., supra* 415 U.S. at 507 n. 14, 94 S.Ct. 1186.

In *United States v. General Dynamics Corp., supra,* the Court explicated the rationale for the affirmative defense:

> [T]he failing-company defense presupposes that the effect on competition and the "loss to [the company's] stockholders and injury to the communities where its plants were operated," *International Shoe, supra* 280 U.S., at 302, 50 S.Ct., at 93, will be less if a company continues to exist even as a party to a merger than if it disappears entirely from the market. It is, in a sense a "lesser of two evils"

n. 34, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States Steel Corp. v. FTC,* 426 F.2d 592, 607–08 (6th Cir. 1970). *See generally* Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv.L.Rev. 226, 339–347 (1960).

**89.** Not surprisingly in light of its strict standard, the failing company defense has seldom prevailed. *See United States v. Phillips Petro-*

*leum Co.,* 367 F.Supp. 1226, 1259 & n. 10 (C.D. Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 2856, 41 L.Ed.2d 1154 (1974); *United States v. M.P.M., Inc.,* 397 F.Supp. 78, 96 & n. 6 (D.Colo.1975). Clearly, even a seriously financially troubled corporation may not qualify as a failing company. *See, e. g., United States v. G. Heileman Brewing Co.,* 345 F.Supp. 117, 122–24 (E.D.Mich.1972).

approach, in which the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business.

415 U.S. at 507, 94 S.Ct. at 1199 [footnote omitted]. *See also Northwest Airlines, Inc. v. CAB,* 112 U.S.App.D.C. 384, 303 F.2d 395, 401 (1962); *United States v. M.P.M., Inc.,* 397 F.Supp. 78, 95 (D.Colo.1975).

In *Citizen Publishing Co. v. United States, supra* 394 U.S. at 138, 89 S.Ct. at 931, the Court stated

[M]oreover, we know from broad experience of the business community since 1930, the year when the *International Shoe* case was decided, that companies reorganized through receivership, or through Chapter X or Chapter XI of the Bankruptcy Act often emerged as strong competitive companies. The prospects of reorganization of the Citizen in 1940 would have had to be dim or nonexistent to make the failing company doctrine applicable to this case.

Decisions subsequent to *Citizen Publishing* have split over the question whether the above language adds a third requirement to the failing company defense. *Compare United States v. General Dynamics Corp., supra* 415 U.S. at 507, 94 S.Ct. 1186 and *United States v. Greater Buffalo Press, Inc., supra* 402 U.S. at 555, 91 S.Ct. 1692 and *Golden Grain Macaroni Co. v. FTC, supra* at 877 and *United States v. M.P.M., Inc., supra* at 96–97 and *Calnetics Corp. v. Volkswagen of America, supra* at 622–23 with *United States Steel Corp. v. FTC, supra* at 608–10 & n. 38 and *United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1259 (C.D.Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 2856, 41 L.Ed.2d 1154 (1974). The weight of authority suggests that dim prospects for bankruptcy reorganization are not essential to successful asser-

tion of the failing company defense. In any event, consideration of this factor does not alter the result reached by the court.

While not conceding a failing company defense in this proceeding, the government does not dispute that McCulloch was a financially troubled company. *See* Plaintiff's Proposed Findings of Fact & Conclusions of Law, ¶¶ 213, 220. Prior to merger McCulloch, a privately held corporation, favored technological innovation and product development even at the expense of profitability.[90] *See* Masterson Tr 4419–25, 4426–27; Jernigan Tr 5138–42; G 288, pp. 6–7; G 472, Exhibit C; D 415; D 434. Exclusive of extraordinary losses and gains, McCulloch's net loss between 1963 and the first nine months of 1973 prior to the merger amounted to approximately 10.6 million dollars. *See* De Podwin Tr 4724–26; D 431. In the eleven years preceding its acquisition by Black & Decker, McCulloch sustained approximately 32 million dollars in losses. In that same period to alleviate the impact of the losses, McCulloch sold land, realizing a profit of 10 million dollars, and sold some of its shares of McCulloch Oil Corporation stock,[91] realizing an 11 million dollar profit. Additionally, McCulloch had equity earnings from the remaining oil stock of about three million dollars. *See* Masterson Tr 4382–87.

Segregating McCulloch's Power Products Division which included its chain saw operations, for the years 1965–1973, McCulloch had net income before tax of 8.2 million dollars on sales of 386.5 million dollars, yielding a pre-tax 2.1 percent rate of return. *See* D 413. This limited profitability contrasts sharply with the remainder of McCulloch's operations which incurred over 20 million dollars in losses on sales of approximately 47 million dollars. *See id.* In the decade preceding the merger McCulloch had profits in only one year, 1969; it broke

---

**90.** Among other projects, McCulloch experimented with developing such products as outboard engines, autogyro airplanes, and snowmobiles. *See* Masterson Tr 4419–20. Between 1965 and 1973, losses on these products and others approximated 30 million dollars. *See* D

434. *See also* D 332. Earlier losses on the outboard engine project exceeded 20 million dollars. *See* Masterson Tr 4420–21.

**91.** *See* note 6 *supra.*

even in one year, 1966; and in all other years, the company suffered losses in varying amounts. See D 411.

Between 1963 and 1973 McCulloch's retained earnings position deteriorated significantly. In 1963 McCulloch had 8.7 million dollars in retained earnings. By 1973, exclusive of accounting adjustments for its McCulloch Oil Corporation stock, the company had negative retained earnings of 2.3 million dollars. See D 436. Overall from 1963 to 1973 stockholders' equity in McCulloch, exclusive of an accounting change which did not reflect actual income, declined by $41,000. See De Podwin Tr 4747–48; D 436. See also D 982. That decline resulted notwithstanding substantial new stock investment into McCulloch. See D 982.

In the ten years preceding the merger McCulloch's working capital also decreased precipitously.[92] In 1963 McCulloch had 8.4 million dollars in working capital to support 41.1 million dollars in sales whereas in the first nine months of 1973 prior to merger McCulloch had only 1.2 million dollars in working capital to support 55.6 million dollars in sales. See D 421; D 431. See also D 422.

These financial difficulties placed McCulloch in a severe cash flow position by mid-1973. One manifestation of the company's problems in this regard was its failure to pay trade debts as they came due. Between 1971 and September 1973, McCulloch's trade accounts payable rose from 5.8 million dollars to 10.8 million dollars. In 1963 those trade debts had totalled 2.7 million dollars. See D 441. To many of its suppliers McCulloch was past due several months and as a result, a variety of sanctions had been applied including stopping of shipments pending payment. See Tess Tr 3960–70, 3972–75; D 78–96; D 271; D 277; D 282–90; D 295–300; D 302; D 304–09; D 329; D 402; D 404–06; D 800; D 807; D 810–11; D 984 (pp. 10–14); D 985 (pp. 10–19); D 986 (pp. 7–9); D 987 (pp. 7–15); D 988 (pp. 10–12).

McCulloch's financial difficulties were compounded by the deteriorating prices of its McCulloch Oil Corporation stock holdings and the relationship of those holdings to its bank debt. By agreement with the Bank of America (Bank) McCulloch had pledged its 2.1 million shares of McCulloch Oil Corporation stock as collateral for certain indebtedness. The value of those shares was to be maintained at 200% of the amount of McCulloch's indebtedness to the Bank. See D 336; D 350–377. Pursuant to a July 1972 agreement with the Bank, McCulloch was to maintain (a) current assets of 6.3 million dollars, (b) a ratio of current assets to current liabilities of 1.25 to 1, (c) net worth of 28 million dollars and (d) debt that did not exceed 120 percent of net worth. See D 338–39. By the terms of the Agreement McCulloch could not merge

---

92. Defendants introduced extensive evidence at trial, including data concerning working capital, in support of their Beaver analysis. Professor William H. Beaver, using six ratios—cash flow to total debt, net income to total assets, total debt to total assets, working capital to total assets, current assets to current liabilities and the no credit interval—the company's cash assets over and above current obligations divided by the cash required for operations—compared data for failing and nonfailing firms. Defendants argue that application of Beaver's methodology to McCulloch indicates the company to be failing. See De Podwin Tr 4771–93; D 427; D 427A; D 427B; D 428; D 428A; D 429; D 429A; D 429B; D 429C. In an effort to update Professor Beaver's data which was comprised of financial information for companies in the 1950's and 1960's, Dr. Horace De Podwin, one of defendants' economists, gathered similar data for failed and non-failed companies in the early 1970's. See De Podwin Tr 4803–16. Comparison of McCulloch's financial information with similar data from these firms also suggested the company to be failing. See id. at 4816; D 971–74. The Beaver analysis, however, rests upon an unfounded assumption. In constructing his methodology, Professor Beaver and Dr. De Podwin in his update, predicate their low probability of error on the dubious assumption that 50 percent of all firms fail. Moreover, in defining failed firms, Professor Beaver includes such indicia as the failure to pay preferred stock dividends. See Jernigan Tr 5147–53. Beaver's standard of failure clearly diverges from the rigorous criteria of International Shoe and Citizen Publishing and, therefore, the Beaver model does not further analysis of the failing company defense.

with another entity without Bank waiver of objection.[93] *See* D 339.

Between March 1972 and September 1973, the value of the McCulloch Oil Corporation stock declined precipitously. In March 1972, that stock sold at 35⅝ per share for a total value exceeding 72 million dollars; by September 19, 1973, the stock sold for 4⅜ per share and was valued at approximately 9 million dollars. *See* D 349. Because of this sharp decline, McCulloch stopped selling the stock in September 1972. *See* Masterson Tr 4390–92. By April 19, 1973 the Bank was no longer fully collateralized under the terms of the Agreement by the McCulloch oil stock. *See* D 349; D 367. By mid-September 1973 the McCulloch oil stock had so declined in value that it no longer even equalled the loan liability to the Bank, much less representing a value of double that liability as provided in the loan agreement. *See* D 376.

By late 1972 McCulloch was in default of other conditions in its Agreement with the Bank. While the Agreement required that McCulloch maintain consolidated working capital of 6.3 million dollars, the company had only 3.7 million dollars. The Agreement required consolidated net worth of 28 million dollars and McCulloch had only 25.3 million dollars. While the Agreement required a current asset to liability ratio of 1.25 to 1, McCulloch's was 1.14 to 1. The Agreement required McCulloch to limit its indebtedness to 120 percent of net worth, or 30.4 million dollars and McCulloch's indebtedness was actually 38.4 million dollars.

*See* D 380. McCulloch thus was in substantial default of its Agreement with the Bank. Upon request the Bank did agree to waive these conditions, but only through July 31, 1973.[94] *See* D 381. The waiver was later extended by the Bank to October 31, 1973 based on the express condition that McCulloch actively pursue its then ongoing merger negotiations with Black & Decker. *See* D 378–79.

By early 1973 McCulloch's financial position was sufficiently precarious that its prospects for raising additional capital were slight. The company in temporarily excused default of its loan agreement could no longer sell McCulloch Oil Corporation stock to realize income. Moreover, McCulloch lacked any further land holdings that could feasibly have been sold in a reasonable period of time without considerable expenditure for site preparation. *See* Masterson Tr 4473–84. In early 1973 McCulloch sought refinancing from the Security Pacific National Bank. After analyzing McCulloch, that Bank declined to extend credit. *See id.* at 4414–16. At trial defendants also offered credible proof that McCulloch because of its poor financial condition would not have been successful in raising funds in the then tight capital and bond markets. *See* Masterson Tr 4414–16; Ross Tr 4569–70; Lehman Tr 4629–30; De Podwin Tr 4820–55; D 336; D 339; D 487–92; D 494; D 499; D 499(f)(1)–(f)(8); D 499G–499L; D 499R; D 991 (pp. 43–44). By the summer of 1973 McCulloch, with all of its assets encumbered, had exhausted any possibility

---

**93.** Other provisions of the Agreement limited McCulloch's ability to raise additional cash. The Agreement prohibited McCulloch, with certain exceptions, from pledging or encumbering real or personal property, from selling or discounting any accounts receivable, from incurring long term debt, from acquiring the business or assets of another concern, and from applying the proceeds of the sale of any assets to anything except the Bank loan. *See* D 338–39. Upon default by McCulloch of any of these conditions, the Bank could declare all amounts due and could enforce payment without a grace period. *See id.* Between December 1971 and September 1973, McCulloch's bank debt doubled from 9.1 million dollars to 18.2 million dollars. *See* D 441.

**94.** By January 31, 1973 McCulloch's indebtedness to the Bank had been classified by the National Bank Examiners as "substandard." *See* D 991 (GMX 13). A "substandard" loan has

> a positive and well-defined weakness or weaknesses that jeopardize the liquidation of the debt. A substandard loan is a bank asset inadequately protected by the current sound worth and paying capacity of the obligor, or pledged collateral . . ..
>
> \* \* \* \* \* \*
>
> Potential, but unrealized, weaknesses are not sufficient cause for a substandard classification.

D 980. *See also* Ross Tr 4556–59.

of further credit from the Bank. *See* Ross Tr 4570, 4613–15.

By the summer of 1973 McCulloch, then, was beset with financial difficulties. Its assets were pledged as collateral for debt, the company was seriously in default of its Bank obligations, its trade debts were severely past due, and new sources of capital were non-existent. The company's financial position was such that but for the merger, McCulloch's independent auditors would not have valued the company as a going concern.[95] *See* Lehman Tr 4627–29.

The government disputes, however, that McCulloch lacked reasonable prospects of rehabilitation. Undoubtedly, McCulloch could have cut its losses by terminating its unprofitable product lines. Also, McCulloch's status as a privately held entity may have reduced pressure for maintaining financially attractive records. *See* Jernigan Tr 5140.

In arguing McCulloch not to have been a failing company, the government emphasizes the company's growing sales, and its strong position in the rapidly expanding gasoline powered chain saw market and occasional user submarket. *See* Jernigan Tr 5130–31; G 312; G 316–316A; G 328; G 341; D 431. Additionally, McCulloch had excellent technical capabilities and enjoyed a strong brand name image. *See* G 285 ("Summary", p. 2, "McC with B & D", p. 2); G 288, p. 5. Perhaps in recognition of these attributes Black & Decker paid an appreciable premium over book value (approximately 22 million dollars) for McCulloch's assets. *See* note 6 *supra;* Lucier Tr 3534; Jernigan Tr 5135; G 346, p. 3; D 436. In fact, Black & Decker has allocated 19.3 million dollars

to goodwill arising out of the McCulloch purchase. *See* G 130, Schedule VII.

While McCulloch had engineering and brand name advantages and could have ceased its unprofitable product lines, the company had so depleted its resources as to make the prospect of rehabilitation remote and the probability of business failure great. Even had McCulloch pruned its operations to its marginally profitable chain saw division, the company's debts were so large, its cash shortage so acute, its paucity of unpledged assets so pronounced, and its possibilities for obtaining new capital so slight that business failure would probably still have resulted. *See* De Podwin Tr 4975. The growing chain saw market augured no more favorable result since McCulloch had slipped into its precarious and worsening financial position in a period of growing sales. The defendants, therefore, have satisfied their burden of proof on the first element of the failing company defense.

Defendants have not satisfied, however, the second aspect of the failing company doctrine—that the failing company was sold to the only available purchaser. McCulloch did not attempt to secure a purchaser alternative to Black & Decker. *See* Masterson Tr 4406–07, 4507. After announcement of the Black & Decker/McCulloch merger, a highly placed McCulloch official was contacted by an official from McGraw-Edison Corporation, a substantial, acquisition-minded company, concerning the possibility of merger.[96] *See* Fiorentino Tr 5256–69; Jt 21. McCulloch refused to pursue the prospect of merging with McGraw-Edison. *See* Fiorentino Tr 5269–71. While

---

**95.** The Bank also believed that but for merger with Black & Decker, McCulloch was headed for bankruptcy and liquidation. *See* Ross Tr 4571, 4586–87. *See also* D 991 (pp. 49, 52–61). McCulloch itself believed that absent merger with Black & Decker, operations would have ceased. *See* Masterson Tr 4382–83. Moreover, had bankruptcy ensued, the prospects for successful reorganization were slight. *See* De Podwin Tr 4968–75.

**96.** Defendants argue that the merger announcement would have precipitated bids from any interested merger partners. *See* De Podwin Tr

4857–59, 4884. In the context of a privately held corporation announcing plans for a prospective merger that conclusion is, however, open to question. *See* Jernigan Tr 5158–59. Moreover, mere announcement of merger plans does not constitute an appropriate search for an alternative purchaser. *See Calnetics Corp. v. Volkswagen of America,* 348 F.Supp. 606, 622–23 (C.D.Cal.1972); *United States v. Pabst Brewing Co.,* 296 F.Supp. 994, 1002 (E.D.Wisc. 1969), *on remand from* 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966).

the McGraw-Edison bid was clearly only a preliminary overture, McCulloch's discouragement of the prospect underscores its negative attitude toward any pursuit of alternative purchasers.

Defendants argue that the Bank, which by the terms of the loan agreement with McCulloch had to approve any merger, effectively precluded consideration of any company other than Black & Decker. Indisputably the Bank, which had urged McCulloch in the past to find a merger partner, wanted the company to pursue actively its negotiations with Black & Decker. *See* Masterson Tr 4503; Ross Tr 4569, 4590, 4610; D 339. When the Black & Decker/McCulloch negotiations began to appear fruitful in late spring of 1973, the Bank believed that any attempt to secure an alternative merger partner could be disruptive. *See* Masterson Tr 4406–07, 4527; Ross Tr 4598–4607A; D 991 (pp. 45–46, 70). Yet the Bank possessed no veto power over McCulloch's negotiating with other companies and there was nothing uniquely attractive about Black & Decker to the Bank that a company of comparable financial strength could not have offered McCulloch. *See* Ross Tr 4608. *See also* D 991 (p. 70). Prior to late spring of 1973, the Bank would not have attempted to halt any search for an alternative merger partner, and it was not until September 1973, that the Bank actually conditioned its waiver of loan defaults on pursuit of merger with Black & Decker. *See* Ross Tr 4604; D 379.

The record discloses that McCulloch single-mindedly explored the possibility of acquisition by Black & Decker without consideration of other companies. While the Bank encouraged this limited search, McCulloch could have sought alternative merger partners which, if financially responsible, would have been approved by the Bank. Defendants have failed, then, to show that Black & Decker was the only available purchaser of McCulloch, and the failing company defense has not been established.[97]

## Conclusions

1. This court has jurisdiction over the parties and the subject matter.

2. The fifty states of the United States are the relevant geographic market.

3. The manufacture and sale of gasoline powered chain saws comprise the relevant line of commerce.

4. The manufacture and sale of occasional user, gasoline powered chain saws, being those saws with suggested retail prices of less than $200, comprise a submarket within the overall gasoline powered chain saw market.

5. Both the overall gasoline powered chain saw market and the occasional user submarket are substantially concentrated. Since defendants failed to meet their burden of showing competitive market performance in either relevant market, the potential competition doctrine is applicable.

6. There is no reasonable likelihood, in either the market or submarket, that the acquisition of McCulloch by Black & Decker may substantially lessen competition or tend to create a monopoly based on an actual potential entrant theory. The

**97.** Defendants argued in their post-trial brief that the alternative purchaser requirement should be dispensed with in the context of a conglomerate merger. *See generally* Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv.L.Rev. 226, 344–46 (1960). While prior cases do not expressly foreclose the possibility of a different, less rigorous failing company standard for conglomerate mergers, they do not on the other hand support a lesser standard. *See United States v. General Dynamics Corp.,* 415 U.S. 486, 506–08, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *United States v. Greater Buffalo Press, Inc.,* 402 U.S. 549, 555–56, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971); *Citizen Publishing Co. v. United States,* 394 U.S. 131, 136–39, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 372 n. 46, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *International Shoe Co. v. FTC,* 280 U.S. 291, 299–303, 50 S.Ct. 89, 74 L.Ed. 431 (1930); *United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1258–60 (C.D. Cal.1973), *aff'd per curiam,* 418 U.S. 906, 94 S.Ct. 2856, 41 L.Ed.2d 1154 (1974); *United States Steel Corp. v. FTC,* 426 F.2d 592, 607–08 (6th Cir. 1970). Even though the merger is of the conglomerate type, the court finds neither justification nor authority to dispense with the alternative purchaser requirement.

government did not demonstrate that feasible means of entry alternative to the McCulloch acquisition existed. Black & Decker lacked the capability of entering either the market or the submarket by internal expansion and feasible toehold acquisitions were unavailable. Moreover, there was no showing that had such alternative means of entry existed, that they offered the promise of producing deconcentration or other significant procompetitive effects.

7. There is no reasonable likelihood that the acquisition of McCulloch by Black & Decker may substantially lessen competition or tend to create a monopoly based on a perceived potential entrant theory. The McCulloch acquisition does not eliminate Black & Decker as the most significant perceived potential entrant into either the market or submarket. Before the merger numerous likely potential entrants existed so that there is no reasonable likelihood that the elimination of Black & Decker as a perceived potential entrant might substantially lessen competition or tend to create a monopoly.

8. There is no reasonable likelihood that the acquisition of McCulloch by Black & Decker might entrench McCulloch as the leader in either the gasoline powered chain saw market or the occasional user submarket.

9. McCulloch was not a failing company.

10. The acquisition of McCulloch by Black & Decker did not violate Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended.

### ORDER

For the reasons set forth in an Opinion of the same date, it is this 20th day of August, 1976, ORDERED by the United States District Court for the District of Maryland that judgment be entered for the defendants and that each side is to bear its own costs.

A copy of the Opinion and Order with confidential portions excised will be inserted in the open Clerk's File. A copy of the Opinion and Order containing the confidential portions shall be sealed and made an appendix to the Clerk's File.